# McCLAIN v. ORTMAYER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 44. Argued October 20, 21, 1891. — Decided November 2, 1891.

If a patentee describes and claims only a part of his invention he is presumed to have abandoned the residue to the public.

Where a claim is fairly susceptible of two constructions, that one will be adopted which will preserve to the patentee his actual invention: but if the language of the specification and claim shows clearly what he desired to secure as a monopoly, nothing can be held to be an infringement which does not fall within the terms which the patentee has himself chosen to express his invention.

The first claim in letters patent No. 259,700, issued June 20, 1882, to Edward L. McClain for a pad for horse-collars, when construed in accordance with these principles, is not infringed by the manufacture and sale of

sweat pads for horse-collars under letters patent No. 331,813, issued December 8, 1885.

Whether a variation from a previous state of an art involves anything more than ordinary mechanical skill is a question which cannot be answered by applying the test of any general definition.

The doctrine which prevails to some extent in England that the utility of a device is conclusively proven by the extent to which it has gone into general use cannot be applied here so as to control that language of the statute which limits the benefit of the patent laws to things which are new as well as useful.

In a doubtful case the fact that a patented article has gone into general use is evidence of its utility; but not conclusive of that, and still less of its patentable novelty.

Letters patent No. 267,011, issued May 13, 1884, to McClain for a pad fastening are void for want of novelty in the alleged invention.

THE court stated the case as follows:

This was a bill in equity for the infringement of two letters patent granted to appellant McClain, viz. patent No. 259,700, issued June 20, 1882, for a "pad for horse-collars," and patent No. 267,011, issued November 7, 1882, for an improvement upon the same. Another patent, numbered 298,626, issued May 13, 1884, to J. Scherling for a "pad fastening," and assigned to the appellant, was originally included in the suit, but was abandoned upon the argument in this court.

In the specification of the first patent, No. 259,700, the patentee stated that his invention related "to that class of horse-collar pads which are placed between the collar and the horse's shoulders, and are adjustably attached to the collar and known as 'sweat pads,'" the object of the invention being "to produce a sweat pad for a horse-collar which can be easily and readily attached to or taken from the collar, and which can be fitted to collars varying in size."

He further stated that the pad proper was "made so as to form an intermediate cushion between the collar and the horse's shoulders and of a size such as to entirely isolate the collar from all portions of the horse's shoulders. . . . The sweat pad, as just described, is not claimed as a new invention. My improvements consist in the addition of springs $s$ $s$ and choke-strap billet loop $b$. The top ends of the pads or bodies

are adjacent [to] the withers of the neck, and are provided with elastic springs — steel — which are so made as to be capable of being opened and then clasped around the body of the sides of the collar. Thus one end of a spring is so curved as to partly encircle the fore wale or small roll of the collar and to hug it so closely as to keep out of the way of the hame, and the other end is so curved as to similarly partly encircle and hug the after wale or body side of the collar and yet not interfere with the hame. Such construction will enable the pad to be easily and readily attached at its top ends to the top ends of the collar, and also will permit of attachment at variable positions along the sides of the collar, so that it can be easily fitted to collars of different sizes."

His claim was —

"1. As attachments to a sweat or other horse-collar pad, the elastic springs *s s*, substantially as described, and for the purposes set forth."

There was a second claim, which, however, became immaterial.

Patent No. 267,011 was for an improvement upon the prior patent, and consisted in discarding that portion of the spring of such patent as embraced the after roll of a collar, and in using the fore roll only. In this connection the patentee stated "that said spring S differs materially from the spring in my previous patent. First, this spring has but one curved portion, intended for the fore roll only of the collar, instead of a curved portion for the fore roll and one for the back roll. The single-roll spring is applicable where the two-roll spring could not be used, and is preferable and cheaper even where the latter can be used. . . . It is therefore seen that the two-roll springs are much more cumbersome to use than single-roll springs, while when the curves of the two-roll springs are repeatedly and much bent they lose their elasticity, and consequently their usefulness. . . . A great feature possessed by pads having the single curved springs is that they can be easily and speedily removed from or attached to a collar, and therefore can be separated from the collar when it is removed from a horse's neck. As an article of manufacture the single-roll spring can be made and attached to a pad at much less

expense than a two-roll spring. First, it does not require so much material; second, it is easier to form and may not require tempering, as the tempered steel in the market may answer where it has been found that such steel will not do for a two-roll spring; third, it is more convenient to attach by riveting by hand or by machinery, for riveting machinery now in use can be used on a single-roll spring, but not on a two-roll one, since the curved ends of the latter project over the rivets."

The claims of this patent were:

" 1. As an attachment to a horse-collar pad or other harness pad, and as a means of adjustably attaching a pad to a horse-collar or other part of harness, the elastic single-roll or single-curved spring S, constructed, arranged, attached and operating substantially in the manner shown or described, and for or with the purposes set forth.

" 2. The combination, with a horse-collar pad, of elastic single-roll or single-curve spring S, substantially in the manner shown or described, and for the purposes set forth."

The answer of defendants denied that the invention relied upon was novel, or that the alleged inventors were the first or original inventors thereof, and also denied that the said improvements contained any invention when compared with the prior art. To the charge of infringement the defendants answered as follows: " These defendants, on their own understanding of the scope and meaning of said several letters patent, and on the advice of counsel in relation thereto, deny that they have ever, in any way, infringed upon the same or upon any of them or upon any claim thereof."

Plaintiff's bill was dismissed by the Circuit Court upon the ground that the first patent was not infringed, and that the second patent, in view of the first, and of the other devices offered in evidence, was void for want of novelty. The opinion of the court is reported in 33 Fed. Rep. 284.

*Mr. James Moore* and *Mr. Edmund Wetmore* for appellant.

*Mr. Thomas A. Banning* (with whom was *Mr. Ephraim Banning* on the brief) for appellees.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

(1) The defence to the first patent was rested principally upon the question of the infringement. Defendants in their answer admitted that they had, as a corporation and individually, manufactured and sold sweat pads for horse-collars under letters patent issued to defendant Ortmayer; "that is to say, sweat pads adapted to be fastened or secured to the collar by a simple hook made of wire, arranged to clasp the front roll of the collar, but not in any way having or employing the pretended inventions and improvements described and claimed in said several letters patent, or either of them."

This patent to Ortmayer, numbered 331,813, exhibits a horse-collar, a sweat pad, a hook made of wire, "its curved or hooked portion being so bent or formed as to clasp the outer or exposed part of the front roll of the collar, and so as to have a broad bearing thereon." The hook is connected to the pad in such a manner as to be joined or hinged thereto so as to be capable of being turned in the fold of the leather. Says the patentee: "To apply the pad to the collar it is only necessary to arrange it underneath the collar in the usual manner, first raising the hooks DD, and then pushing them downward, so that they will clasp the front roll of the collar."

It is evident from this patent and from the entire testimony that the defendants made use of a single hook D, embracing the front roll of the collar only, while the appellant McClain has limited himself, perhaps unnecessarily, to the elastic springs $s$ $s$, which the drawings and the whole tenor of the specification show to be double and intended to be clasped around both the fore and after wales of the collar. While the patentee may have been unfortunate in the language he has chosen to express his actual invention, and may have been entitled to a broader claim, we are not at liberty, without running counter to the entire current of authority in this court, to construe such claims to include more than their language fairly imports. Nothing is better settled in the law of patents than that the patentee may claim the whole or only a part of

his invention, and that if he only describe and claim a part, he is presumed to have abandoned the residue to the public. The object of the patent law in requiring the patentee to "particularly point out and distinctly claim the part, improvement or combination which he claims as his invention or discovery," is not only to secure to him all to which he is entitled, but to apprise the public of what is still open to them. The claim is the measure of his right to relief, and while the specification may be referred to to limit the claim, it can never be made available to expand it. Thus in *Keystone Bridge Company* v. *Phœnix Iron Company*, 95 U. S. 274, 278, the manufacture of round bars, flattened and drilled at the eye, for use in the lower chords of iron bridges, was held not to be an infringement of a patent for an improvement in such bridges where the claim in the specification described the patented invention as consisting in the use of wide and thin drilled eye bars applied on edge. In delivering the opinion of the court, Mr. Justice Bradley observed: "It is plain, therefore, that the defendant company, which does not make said bars at all," (that is, wide and thin bars,) "but round or cylindrical bars, does not infringe this claim of the patent. When a claim is so explicit, the courts cannot alter or enlarge it. If the patentees have not claimed the whole of their invention, and the omission has been the result of inadvertence, they should have sought to correct the error by a surrender of their patent and an application for a reissue. . . . But the courts have no right to enlarge a patent beyond the scope of its claim as allowed by the Patent Office, or the appellate tribunal to which contested applications are referred. When the terms of a claim in a patent are clear and distinct, (as they always should be,) the patentee, in a suit brought upon the patent, is bound by it. . . . He can claim nothing beyond it."

Similar language is used in *Railroad Company* v. *Mellon*, 104 U. S. 112, in reference to a patented locomotive wheel. In *Masury* v. *Anderson*, 11 Blatchford, 162, 165, it was said by Mr. Justice Blatchford: "The rights of the plaintiff depend upon the claim in his patent, according to its proper construction, and not upon what he may erroneously suppose it

covers. If at one time he insists on too much, and at another on too little, he does not thereby work any prejudice to the rights actually secured to him." Other cases to the same effect are *Merrill* v. *Yeomans*, 94 U. S. 568; *Burns* v. *Meyer*, 100 U. S. 671; and *Sutter* v. *Robinson*, 119 U. S. 530.

It is true that, in a case of doubt, where the claim is fairly susceptible of two constructions, that one will be adopted which will preserve to the patentee his actual invention; but if the language of the specification and claim shows clearly what he desired to secure as a monopoly, nothing can be held to be an infringement which does not fall within the terms the patentee has himself chosen to express his invention. The principle announced by this court in *Vance* v. *Campbell*, 1 Black, 427, that, where a patentee declares upon a combination of elements which he asserts constitute the novelty of his invention, he cannot in his proofs abandon a part of such combination and maintain his claim to the rest, is applicable to a case of this kind where a patentee has claimed more than is necessary to the successful working of his device.

Applying these familiar principles to the case under consideration, we are forced to the conclusion that the curved hook of the defendant is not an infringement of the double spring described in the plaintiff's specification and claim. While a single spring or hook embracing the fore wale of a collar may be equally as efficacious, the patentee is no more at liberty to say that the spring encircling the after wale is immaterial and useless than was the patentee in *Vance* v. *Campbell* to discard one of the elements of his combination upon the same ground. This was evidently the theory of the patentee himself, since, a little more than two months after this patent was issued, in a letter to the Patent Office of September 2, 1882, in which he made application for his second patent, covering the single-roll spring, he stated that "the single-roll spring must be conceded to be a structure positively and unequivocally different from the two-roll spring." There being no infringement of this patent, there can be no recovery upon it.

(2) The second patent was principally contested upon the ground of want of invention. In his specification the patentee

states it to be an improvement upon his prior patent, but differing materially from it in the fact that "this spring has but one curved portion, intended for the fore roll only of the collar, instead of a curved portion for the fore roll and one for the back roll." It seems from his letter to the Patent Office of September 2, 1882, to which reference has already been made, that in endeavoring to practice the invention in his prior patent, he found that the two-roll spring was not generally applicable to collars of different sizes, as it had been supposed it would be; as the rolls in collars of different sizes and of different make varied so much that, while it would make a pad applicable to collars of different sizes for light work, the same pad could not be used on collars for heavy work, and hence the invention proved to be imperfect. This resulted in the invention of the single-roll spring of his second application.

Practically, the only novelty consists in cutting the double-roll spring in two and using the fore roll only. While this enables the pad to be located on the collar more readily than when two springs were used, the roll performs the same function as in the prior patent, and the patent can only be sustained upon the theory that the discarding of the after roll involved invention. What shall be construed as invention within the meaning of the patent laws has been made the subject of a great amount of discussion in the authorities, and a large number of cases, particularly in the more recent volumes of reports, turn solely upon the question of novelty. By some, invention is described as the contriving or constructing of that which had not before existed; and by another, giving a construction to the patent law, as "the finding out, contriving, devising or creating something new and useful, which did not exist before, by an operation of the intellect." To say that the act of invention is the production of something new and useful does not solve the difficulty of giving an accurate definition, since the question of what is new as distinguished from that which is a colorable variation of what is old, is usually the very question in issue. To say that it involves an operation of the intellect, is a product of intuition,

or of something akin to genius, as distinguished from mere mechanical skill, draws one somewhat nearer to an appreciation of the true distinction, but it does not adequately express the idea. The truth is the word cannot be defined in such manner as to afford any substantial aid in determining whether a particular device involves an exercise of the inventive faculty or not. In a given case we may be able to say that there is present invention of a very high order. In another we can see that there is lacking that impalpable something which distinguishes invention from simple mechanical skill. Courts, adopting fixed principles as a guide, have by a process of exclusion determined that certain variations in old devices do or do not involve invention; but whether the variation relied upon in a particular case is anything more than ordinary mechanical skill is a question which cannot be answered by applying the test of any general definition.

Counsel for the plaintiff in the case under consideration has argued most earnestly that the only practical test of invention is the effect of the device upon the useful arts — in other words, that utility is the sole test of invention, and, inferentially at least, that the utility of a device is conclusively proven by the extent to which it has gone into general use. He cited in this connection certain English cases which go far to support his contention. These cases, however, must not be construed in such way as to control the language of our statute, which limits the benefits of patent laws to things which are new as well as useful. By the common law of England, an importer — the person who introduced into the kingdom from any foreign country any useful manufacture — was as much entitled to a monopoly as if he had invented it. Thus in *Darcy* v. *Allin*, Noy, 173, it is stated that " where any man, by his own charge and industry, or by his own wit or invention, doth bring any new trade into the realm, or any engine tending to the furtherance of a trade that never was used before . . . the king may grant to him a monopoly patent . . . in consideration of the good that he doth bring by his invention to the commonwealth," citing several instances of skill imported from foreign countries. In *Edgebury* v. *Stephens*, 1 Webster's Pat. Cas. 35,

it was said: " The act [of monopolies] intended to encourage new devices useful to the kingdom, and whether learned by travel or by study it is the same thing."

It is evident that these principles have no application to the patent system of the United States, whose beneficence is strictly limited to the invention of what is new and useful, and that the English cases construing even their more recent acts, must be received with some qualification. That the extent to which a patented device has gone into use is an unsafe criterion even of its actual utility, is evident from the fact that the general introduction of manufactured articles is as often effected by extensive and judicious advertising, activity in putting the goods upon the market and large commissions to dealers, as by the intrinsic merit of the articles themselves. The popularity of a proprietary medicine, for instance, would be an unsafe criterion of its real value, since it is a notorious fact that the extent to which such preparations are sold is very largely dependent upon the liberality with which they are advertised, and the attractive manner in which they are put up and exposed to the eye of the purchaser. If the generality of sales were made the test of patentability, it would result that a person by securing a patent upon some trifling variation from previously known methods might, by energy in pushing sales or by superiority in finishing or decorating his goods, drive competitors out of the market and secure a practical monopoly, without in fact having made the slightest contribution of value to the useful arts. The very case under consideration is not barren of testimony that the great success of the McClain pads and clasping hooks, a large demand for which seems to have arisen and increased year by year, is due, partly at least, to the fact that he was the only one who made the manufacture of sweat pads a specialty, that he made them of a superior quality, advertised them in the most extensive and attractive manner, and adopted means of pushing them upon the market, and thereby largely increased the extent of their sales. Indeed it is impossible from this testimony to say how far the large sales of these pads is due to their superiority to others, or to the energy with which they were forced upon the market.

While this court has held in a number of cases, even so late as *Magowan* v. *The New York Belting and Packing Co. ante,* 332, decided at the present term, that in a doubtful case the fact that a patented article had gone into general use is evidence of its utility, it is not conclusive even of that — much less of its patentable novelty.

In no view that we have been able to take of the case can we sustain the second McClain patent. We do not care to inquire how far it was anticipated by the various devices put in evidence, showing the use of a similar spring for analogous purposes, since we are satisfied that a mere severance of the double spring does not involve invention, at least in the absence of conclusive evidence that the single spring performs some new and important function not performed by it in the prior patent. The evidence upon this point is far from satisfactory, and the decree of the Circuit Court must, therefore, be

*Affirmed.*

The CHIEF JUSTICE and MR. JUSTICE GRAY did not hear the argument and took no part in the decision of this case.