### RAND, McNALLY & CO. v. EXCHANGE SCRIP-BOOK CO.

(Circuit Court of Appeals, Seventh Circuit. January 10, 1911. Rehearing Denied April 11, 1911.)

No. 1,718.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—EXCHANGE SCRIP-BOOKS.

The Richardson and Langston patent, No. 669,489, for a scrip-book containing a series of coupons to be detached and exchanged for passage-tickets, the essential feature of which is that the units are expressed in money instead of in miles, as in ordinary mileage tickets, which adapts them to more convenient use on transportation lines having different rates, discloses patentable invention, and is valid; also *held* infringed.

Carpenter, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the Exchange Scrip-Book Company against Rand, McNally & Co. Decree for complainant, and defendant appeals. Affirmed.

The appeal is from a decree enjoining appellants from infringing claim 4, of letters patent No. 669.489, issued March 5, 1901, to appellee, on the application of Joseph Richardson and George D. Langston, for certain improvements in Railway Tickets. Claim 4 of the patent is as follows:

"4. A scrip-book having as integral parts thereof a strip or series of coupons to be detached and exchanged at ticket-offices for passage-tickets, certificates or stubs having appropriately-designated spaces to receive descriptions of such tickets respectively and the signatures of successive conductors honoring each ticket, and ownership certificates having appropriately-designated spaces for successive signatures of the passenger in the presence of the respective conductors, the several parts being mutually identified by identical marks such as numbers."

Other patents cited are the following:

    No. 163,732, L. Brush, May 25, 1875.
    No. 304,529, C. J. Knapp, Sept. 2, 1884.
    No. 342,941, W. A. Thrall, June 1, 1886.
    No. 409,203, L. D. Heusner, Aug. 20. 1889.
    No. 473,592, W. B. Shattuc, April 26, 1892.
    No. 590,651, C. N. Souther, Sept. 28. 1897.
    No. 617,205, W. A. Thrall, Jan. 3, 1899.

Further facts are stated in the opinion.

L. M. Hopkins, for appellant.

Samuel W. Banning, for appellee.

Before GROSSCUP and SEAMAN, Circuit Judges, and CARPENTER, District Judge.

GROSSCUP, Circuit Judge, delivered the opinion.

Apart from the main idea of the patentees, that the unit in their patented ticket should be expressed in money instead of miles, we do

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

not see anything in the patent that the defendants have infringed; for whether the physical differences, introduced by the patentees, are patentable invention or not, they are so narrow, and make the patent so limited, that the alleged infringing device (differing also in form) does not seem to us to be included.

Does the adaptation of this new ticket to a unit, based on money instead of miles, make it patentable invention? Originally, mileage tickets were confined, by the railroads, to the roads issuing them; but in the course of growing needs for wider transportation facilities, the railroads adopted interchangeable mileage tickets. These mileage tickets were good upon different roads, and on their face showed, without calculation (where the mileage rate was the same), what both the traveler and the carrier were entitled to. But when the mileage rate differed with the differing carriers, the matter was different. The ticket here patented, is the first character of ticket that can be made interchangeable between any and all carriers without the necessity of calculation by the passenger or the carrier, irrespective of what the rate may be. This difference, between the mileage form of ticket and the patented ticket in question, can be brought out best, perhaps, by an illustration.

Suppose a traveler has a ticket, good from Chicago to Milwaukee and interchangeable between the steamship and the railroad lines, but the amount of transportation it is good for is expressed on the face of the ticket in miles. If such ticket be purchased on the basis of the railroad rate, and he takes it to the railroad office, eighty-five coupons, representing $1.70 initial investment, will be taken out, which represents, without calculation on either his part or that of the carrier, what he ought to give up for this particular passage. But if he takes it to the steamship office, whose rate between the two points is $1.00 instead of $1.70, it will require calculation, both upon his part and that of the agent of the steamship company, to determine how many mileage coupons shall be taken out; for how is he to translate the cost of this trip by steamer into miles, so as to enable him to determine the number of mileage coupons to be detached, except by a calculation, which may be easy or may be difficult, according to his experience or expertness in figures?

With this patented ticket, however, a traveler from Chicago to Milwaukee can select either the railway or the steamship line as his carrier, and, without making any calculation upon the difference in basis of rates, utilize the ticket for his transportation. The rate by rail is $1.70—the conductor simply takes out 170 coupons, the scrip-strip unit being one cent. The rate by water is $1.00—the collector or purser simply takes out 100 coupons. Without any change, the ticket answers for both rates; irrespective of mileage, or whether the rate is calculated on the railroad or the steamship basis. It is "scrip," a medium of exchange, or a letter of credit, good with each character of carrier that, for the given number of miles he wishes to go, will carry him for a certain sum of money. In this respect it is different from the Thrall mileage book and from all preceding mileage books, though they were similar in outward form; and it is on this account

that this ticket has been put into use on thirty-nine different transportation companies, including railroad, steamship and stage coach lines, and the like, irrespective of how widely the mileage rate differed. True, in the Thrall and other mileage books, as in this ticket, there is a continuous strip of ribbon, divided into a series of consecutively numbered parallel spaces, arranged with folds within the cover, and designed to be detached in any desired portions upon the numbered lines separating the spaces. True, also, that upon an order from headquarters, the different railroad, steamship or stage coach offices might treat each space, in the Thrall or other mileage books, as so much money instead of so many miles, varying according to the mileage rates on each. But this would mean that the whole ticket should be thrown away and another substituted, for twenty dollars divided into one cent coupons would be twice as large a ticket as a mileage ticket worth twenty dollars at a two-cent rate, and two and a half times larger where the rate is three cents. In other words, the old ticket is thrown away and this patented ticket substituted; unless, of course, as already stated, it was left to both the carrier and traveler to make the calculation necessary to translate the mileage tickets, as they now stand, in money cost. The ticket in question here avoids all such necessity for calculation by adopting a standard, expressed on the face of the ticket, that indicates to both carrier and traveler, without calculation, just what each one is entitled to.

Unquestionably, the idea embodied in this ticket is a happy one. Possibly it has followed naturally, and without the employment of inventive thought, the wider use of interchangeable tickets. Possibly the wider use of interchangeable tickets has followed the embodiment of this idea. Which is cause and which is effect, and to what extent one is cause and the other is effect, we have no means of determining. The record does not help us on that inquiry. All that we know is, that it was not used before appellee's patent, and that it has been followed by the widest use. This, it seems to us, implies that the conception of this ticket, at least, helped to bring about the idea of a wide interchangeable use. There is no ground, under such circumstances, for saying that the concept is necessarily obvious. It is equally probable that it was this new concept that made the wider use of interchangeable tickets commercially obvious.

Nor do we think that this patented concept is nothing more than a business method. Its use is a part of a business method. The ticket patented is not a method at all, but a physical tangible facility, without which the method would have been impracticable, and with which it is practicable. And this is the status of thousands of like facilities that, once designed and put into use, have become the first of a new business method; and patents on such facilities have been sustained.

The decree of the Circuit Court is affirmed.

CARPENTER, District Judge (dissenting). For the convenience of constant travelers, especially commercial travelers, the various railroad companies many years ago prepared and sold what were known

as mileage books. These books enabled the purchaser and holder to travel for 1,000 or 2,000 miles over the line of a given railroad. In consideration of the wholesale character of the mileage ticket, a rebate was made to the purchaser when the last coupon was used, provided, through a more or less intricate means of identification, it appeared that the holder and user himself, and no other person, had made use of the coupons. It is a matter of common knowledge, especially in commercial circles, that it was not unusual for a traveling salesman to carry as many as 10 or 15 mileage books at one time, which he made use of in a continuous or broken trip over as many different lines of railroad. It is also a matter of common knowledge that our commerce has been extended largely through the medium of traveling salesmen, who go about the country exhibiting samples of the product sold or manufactured by their employers, and securing orders which are returned to the parent house. This system of doing business became so extended that the convenience of the traveling public engaged in it required the railroads to devise some plan which would obviate the necessity of each individual traveler carrying as many mileage or coupon books as there chanced to be railroad lines over which he was obliged to travel. Accordingly, the railroad companies within a given zone of rates agreed that the mileage books issued by one company should be honored upon the lines of another, and by the common system of clearing used by the banks the accounts were adjusted at stated periods, and each company in the association charged with its own coupons in the hands of other lines and credited with all foreign coupons. The practice was for the passenger to exchange with the agent of the road at the point of departure a sufficient number of mileage coupons for a first-class ticket.

A number of patents have issued on the mileage coupon ticket, most of them enumerated in the opinion of the majority of the court, and in all of those patents the unit of the coupon appears to have been one mile, although each coupon was numbered from 1 to 1000 or from 1 to 2000, depending upon the size of the ticket, and did not itself indicate what the unit was. These tickets were arranged in convenient physical form, each containing a contract which was acceptable to the association of railroads honoring the tickets, and each with various methods of identifying the lawful holder and user. The interchangeable mileage book was a direct advance in convenience over the individual mileage book, and obviously was adopted for the convenience of the user rather than for the convenience of the railroads.

The duties of traveling salesmen called them everywhere in this country, and in many instances it was necessary to travel, not only over different lines of railroad, but by steamboat or canal lines. It became necessary for the traveler to transfer, especially in large cities, from one railroad to another, requiring not only transportation for his person, but also for his baggage. Considering that many salesmen carry a complete line of samples, the question of the transfer of baggage was not an unimportant one. Bearing in mind that in the nature of things the interchangeable ticket, whether representing a unit of cents or a unit of miles, was devised for the convenience of the

traveling public, and through that convenience, I dare say, to enlarge the sale of tickets, the problem which confronted the railroads was how to devise a ticket, interchangeable among the railroad members of the given association, which would adapt itself to different mileage rates and different localities, to steamboat and canal rates, and to the charges of baggage transfer agents and express companies. To quote from appellee's brief:

"In the year 1899 Mr. Joseph Richardson was chairman of the Southeastern Passenger Association, and Mr. George D. Langston was secretary or assistant secretary. The inventors were in a position to be fully conversant with the needs of the railroads and were fully familiar with the difficulties to be overcome and the objects sought to be obtained."

When the departure was made from the individual mileage book to the interchangeable mileage book, no substantial alteration was made in the physical character of the ticket. To those skilled in the operation of the passenger departments of railroads the means necessary to bring about the required result were obvious. It required merely a general clearing house agreement to make the ticket interchangeable. When the public demand arose for tickets which might be used upon railroads allowed to charge different rates per mile, and upon steamboat and express lines, the natural and obvious means of accomplishing that result, and the one which must have occurred to any skilled railroad passenger agent, was the adoption of the money unit instead of the mile unit. This system of business was well known to the commercial world, which long had made use of bank checks, letters of credit and express company's checks or orders.

Whenever a given mechanical device fails in some respect to accomplish the desired result, and there suggests itself to the mind of any skilled mechanic an easy mechanical method of improvement, this is not regarded as invention and is not patentable under our laws.

The majority of the court say:

"Apart from the main idea of the patentees, that the unit in their patented ticket should be expressed in money instead of miles, we do not see anything in the patent that the defendants have infringed."

The sole question, therefore, in this case, is whether, in view of the prior state of the art, and considering the evolution in the use of mileage books, the men who conceived the idea of attributing to the little sections or coupons of the mileage ticket a value in money instead of miles, and that, too, without making any physical change in the tickets theretofore used, have exhibited the intuition of the inventor, or, being highly educated in the art of railroading and commerce, have adopted a simple and obvious system of surmounting a difficulty regarding tickets, just as the skilled mechanic uses some well-known mechanical means to surmount a mechanical difficulty.

It is true that never before had these coupons represented money, and that since the patent involved here was issued many railroads, steamboat lines, and express companies have entered into an agreement to use the tickets. I realize that an immediate and extensive use of a new device is a very persuasive argument in favor of its being the result of inventive genius; but in this case it seems to me

that the new use of the old device resulted from the demands of the travelers. The situation was ripe for a change, and as soon as the demand arose these patentees, who were practical railroad men, adopted immediately a simple method of bringing it about, one which must have been obvious to any one engaged in that line of business.

In the prevailing opinion it is stated:

"Unquestionably, the idea embodied in this ticket is a happy one. Possibly it has followed naturally, and without the employment of inventive thought, the wider use of interchangeable tickets. Possibly the wider use of interchangeable tickets has followed the embodiment of this idea. Which is cause and which is effect, and to what extent one is cause and the other is effect, we have no means of determining. The record does not help us on that inquiry. All that we know is, that it was not used before appellee's patent, and that it has been followed by the widest use. This, it seems to us, implies that the conception of this ticket, at least, helped to bring about the idea of a wide interchangeable use. There is no ground, under such circumstances, for saying that the concept is necessarily obvious. It is equally probable that it was this new concept that made the wider use of interchangeable tickets commercially obvious."

If this were a doubtful case, this argument would have great force as to the utility of the patent; even so it would not be conclusive of the utility, much less of its patentable novelty. McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800.

In a clear case of unpatentability the argument has no force. As well invoke the well-known canons of construction regarding a contract couched in plain and simple language and where there is nothing to construe.

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers, who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities and vexatious accountings for profits made in good faith." Mr. Justice Bradley, in Atlantic Works v. Brady, 107 U. S. 200, 2 Sup. Ct. 231, 27 L. Ed. 438.

In Hollister v. Benedict Manufacturing Co., 113 U. S. 59, 5 Sup. Ct. 717, 28 L. Ed. 901, the device claimed was new in the sense that it had not been anticipated by any previous invention, and it was shown to have superior utility. The claim was:

"A stamp, the body of which is made of paper or other material, and having a removable slip of metal or other material displaying thereon a serial number, or other specific identifying mark corresponding with a similar mark upon the stub, and so attached that the removal of such slip must mutilate or destroy the stamp."

The part designed to become a stub when the stamp proper was separated was well known; so, also, was the part of the stamp de-

signed to be attached permanently to a barrel. The part of the stamp proper, displaying the same identifying serial number as the stub, and which was so affixed that it could be removed and retain its own integrity, but at the same time mutilate and cancel the stamp by its removal, was not new so far as its contents were identical with those on the stub. But the question turned, however, on that feature of the third element whereby a removable part of the stamp proper, the contents of which identify the stamp with the stub after the stamp has been attached, can be removed so as to retain its own integrity, but mutilate and thereby cancel the stamp by its removal. This was held not to be a patentable invention. Mr. Justice Matthews, speaking for the court, said:

"The idea of detaching that portion of the stamp, with the double effect of destroying the stamp by mutilation and preserving the evidence of the identity of the package on which it had been first placed in use, which is all that remains to constitute the invention, seems to us not to spring from that intuitive faculty of the mind put forth in the search for new results, or new methods, creating what had not before existed, or bringing to light what lay hidden from vision, but, on the other hand, to be the suggestion of that common experience which arose spontaneously and by a necessity of human reasoning, in the minds of those who had become acquainted with the circumstances with which they had to deal. Cutting out a portion of the stamp, as a means of defacing and mutilating it, so as to prevent a second use, was matter of common knowledge and practice, before the date of this patent; and cutting out a particular portion, on which the identifying marks had been previously written or printed, was simply cutting a stub from the stamp, instead of cutting the stamp from the stub, as before. So that, when the frequency and magnitude of the frauds upon the revenue, committed by the removal of tax-paid stamps from packages, on which they had been originally placed by the officer, to others surreptitiously substituted for them, or by emptying the packages of their original contents, and fraudulently refilling them with spirits on which no tax had been paid, attracted the general attention of the revenue department, the answer to the problem of prevention was found by immediate inference from the existing regulations, in the adoption of the expedient now in question. As soon as the mischief became apparent, and the remedy was seriously and systematically studied by those competent to deal with the subject, the present regulation was promptly suggested and adopted, just as a skilled mechanic, witnessing the performance of a machine, inadequate, by reason of some defect, to accomplish the object for which it had been designed, by the application of his common knowledge and experience, perceives the reason of the failure, and supplies what is obviously wanting. It is but the display of the expected skill of the calling, and involves only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice; and is in no sense the creative work of that inventive faculty which it is the purpose of the Constitution and the patent laws to encourage and reward."

A ticket strip imprinted decimally for ready subdivision at the length desired, with separate stub for agent's voucher at the free outer end, and a descriptive blank for identification of the buyer at the inner opposite end, where the strip joins to the protective cover, had been known long before. These distinctive parts of the patented ticket were identically the same and were put to the same use as in the earlier forms.

The only variation was in the mileage strip. But even there, the strip was divided off into fractional lengths, according to the decimal

system, just as in the earlier forms. However, instead of attributing to the decimal subdivision an arbitrary value in miles, the new scheme proposed to attribute to the same divisions an arbitrary value in cents. The result was to estimate the journey in terms of money, instead of in terms of distance.

A shift from one arbitrary standard to another, without change of structure or function, is all that appears. Whatever convenience attaches may be fairly attributed to a more unified plan of co-operation developed later between competing roads. Even now, if the journey undertaken is of composite sort, as, for example, the passenger buys a through ticket from Madison, Wis., via land to Milwaukee, thence by boat to Grand Haven, and finally by land again to Detroit, his ticket may require a variable length to be taken, dependent on the schedules of rates fixed by Wisconsin and by Michigan for their railroads, and still another, or third rate, for the water transit. Whether treated in terms of miles or in terms of cents, the decimal strip is separated at its appropriate line in exact accord with the standing rule or estimate established by the general officer of the road.

The inventors in this case have not devised "any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof," or any new, original and ornamental design for any article or manufacture. Aside from these specific classes, no invention or improvement, however useful and novel it may be, is patentable. Jacobs v. Baker, 7 Wall. 295, 19 L. Ed. 200. Fond du Lac County v. May, 137 U. S. 395, 11 Sup. Ct. 98, 34 L. Ed. 714.

They have, at the most, advised the railroads of a desirable change in their method of doing business. They have suggested a valuable change in system. Had the original coupons represented ten cents each, or five cents each, there would have resulted a considerable difficulty in making the exact change when the coupons were exchanged with the ticket agent for a first-class ticket. Would a suggestion that the unit of one cent be used, instead of five cents, represent inventive genius? Clearly not. The defect in the system would have been obvious, and the remedy equally obvious. If it could be demonstrated that a coupon unit representing English pennies or French centimes would make it easier for the purchaser and the agent to calculate the required number to be deducted whenever a first-class ticket is sought, would the idea that such a change be made involve anything more than a change in the system? Or would a change from miles to kilometers? I admit the usefulness of the new system, just as I would admit the usefulness of the various short-cut methods of computing interest or of multiplication or subtraction; just as I would admit the usefulness of a business house keeping a complete set of books. I cannot admit that a new and shorter method of computing interest, or a new and less complicated system of bookkeeping, involving fewer books and less labor, while highly useful and desirable, can form (there being no new physical device) the basis of a patentable invention. The idea of the inventors in the present case involves merely

a change of method of doing business, following simply and obviously from a change in conditions.

The old mileage book was susceptible, reasonably and fairly, of the very use suggested by Langston and Richardson. Their idea pertained to the same art covered by Thrall and his predecessors, and is not entitled to such consideration as it would receive if applied to some remote art.

The railroads which, since September 1897, have been using the interchangeable mileage book of the Thrall type, could continue to use the same book without physical change, and accomplish the desired adjustability to rates by issuing general orders to their agents and by advising their customers that after a certain date the unit of the coupon would represent cents and not miles. It would be the old ticket in its old form, used in the old way, changed in the nominal value of its unit by new orders to agents, and maybe by new contracts with purchasers. The form of the patent in this case has been anticipated. The new system of its use, in my opinion, is not patentable.