## AMERICAN PAD & TEXTILE CO. v. CLUFF FABRIC PRODUCTS, Inc.

District Court, S. D. New York.
March 12, 1943.

William I. Hart, of New York City, and Murray, Sackhoff & Paddack, of Cincinnati, Ohio (Walter F. Murray and Murray Paddack, both of Cincinnati, Ohio, of counsel), for appellant.

David G. Stember, of New York City, for defendant.

KNOX, District Judge.

Plaintiff here sues defendant for the latter's alleged infringement of Potter Patent No. 1,536,627 and Brown Patent No. 1,994,189, both of which are owned by plaintiff.

The patent first mentioned was issued May 5, 1925. It relates to an improvement in life preservers, particularly to those designed to prevent the drowning of an unconscious wearer. More specifically, Potter's device is intended to maintain its wearer in a backwardly reclining position with his face well out of the water. By virtue of the arrangement of the kapok entering into its construction, it will quickly turn the wearer on his back, regardless of the position in which he may have entered the water, thus, it is claimed, greatly increasing the chances of the wearer's survival. Claims 1, 2, 6 and 15 of the patent are in suit.

Claim 1 reads: "A jacket life preserver opening down the front and buoyantly reinforced adjacent its meeting edges and means for circumferentially contracting the jacket and bulging said buoyant material outwardly from the body of the wearer."

Claim 2 states, in addition to the elements of Claim 1, that the buoyant material shall be bunched adjacent the front median line of the jacket.

· Claim 6 is to the effect that the preserver shall have such a preponderance of forwardly extending buoyant material that the metacenter of the preserver and wearer will lie below the center of gravity when the wearer is face down in the water.

Claim 15 specifies a preserver adapted to maintain an unconscious wearer face upward in the water, including means operable when the wearer is in face downward position to prevent the metacenter from vertically aligning with the center of gravity.

Brown's patent, issued upon March 12, 1933. It contains but one claim reading as follows: "A life preserver in the form of a reversible jacket openable and closable vertically of the front and characterized by a pair of soft buoyant tunnel members forming the front vertical edge portions of the jacket, said members in cross section being substantially rounded and of greatly enlarged dimensions relative to the remainder of the jacket, the upper portions of the tunnel members being curved inwardly toward the neck of the jacket and provided with fastening means whereby said upper portions, when the jacket is in position, may be drawn toward one another and secured in snug and extended engagement with the sides of the wearer's head for comfortably pillowing the head and for substantially precluding turning thereof, and a pair of adjacently positioned buoyantly stuffed pocket members forming the back of the neck of the jacket and meeting along a vertical line whereby a crotch is formed adapted to snugly receive the back of the wearer's head, and to aid in precluding turning of the head, said tunnel members being adapted to turn and retain the wearer on his back in the water."

Plaintiff has manufactured reversible life preservers pursuant to the teachings of the Brown patent and, according to plaintiff's witnesses, such preservers will

invariably function as they are designed to perform. This testimony is uncontradicted. And, at a time when life preservers are needed as never before, the patents, if they have really advanced the art of life-saving devices, are entitled to liberal treatment.

The gist of the disclosure is that, in fabricating a kapok life preserver, a preponderance of this material is encased in sleeves or tunnels to be fitted to the front side of the body, and beneath the chin of the wearer. If the wearer then falls or is catapulted, into water, the operation of physical laws will be such as to turn him face upwards, which, of course, will be to his great advantage.

█ Defendant contends, however, that Potter's patent differs little from the disclosures of other inventors, running back as far as 1912. The patent to Carroll No. 1,028,433, says defendant, specifies the use of a buoyant material consisting of cork-dust, quills, kapok or the like, and that, as a result, plaintiff can predicate no patent rights upon the use of kapok. That, of course, is true. But, if it be that the arrangement and disposition of the kapok, as disclosed by plaintiff's patents, will serve to save lives that under the prior devices would be lost, the art has received a contribution that is well worth while. Basically, then, the question is whether or not this represents the fact. As everyone knows, life preservers of different types have long been known and used. So far as the present suit is concerned, the most pertinent example of the prior devices is the kapok life preserver in use by the United States Navy. This is manufactured pursuant to a standard plan adopted by the Bureau of Construction and Repair of the Navy Department upon March 20, 1920. This device is considerably more elaborate and expensive than either of the constructions involved in this litigation and, as a matter of fact, both parties, in addition to their own products, are now manufacturing, pursuant to Navy requirements, thousands of life preservers for use by the armed forces of the United States.

If these latter devices possess the life saving qualities ascribed to preservers made pursuant to the teachings of the patents in suit, they cannot, notwithstanding their cheaper costs, be said to disclose inventive genius. The differences in costs, between the Navy preserver and those of the parties, are due largely, if not entirely, to the size of the respective jackets, their stitching, the quality of their material, and the flame resisting properties of their constituent elements.

Brown describes the Navy device as being "made up with two large wide pockets covering practically the whole front of the jacket, and in the back there is a large compartment that covers practically all the back, extending all the way down to the bottom of the jacket up to the top, and it has a collar which is shaped different from the other. This, (the collar) is separate and apart from the body of the jacket. On the other jacket (plaintiff's device) this roll comes up and comes back of the head, if you might speak of that as in the collar, but this (the Navy jacket collar) is a separate unit, and is sewed and attached to the jacket after the body has been made.

Being asked what would be the function of the two kapok filled pockets on each side of the front of the Navy jacket, Brown replied: "Whether you have the collar attached or detached, this vest will not turn you over. If you fall forward on your face, you will remain with your face in the water unless you exert some power of your own to adjust yourself." He went on to say that this result would be due to the buoyancy created by the arrangement of the kapok in the back of the vests. It would tend, as I understood the witness, to counter-balance the buoyancy of the kapok in the front of the jacket.

Brown then proceeded to relate how the development of his device came about. Stating that any life preserver designed for use on ocean going vessels would have to win approval by the Department of Commerce, and that, wanting to go into this line of business, he wished to be sure that he would do nothing contrary to the Department's rules. So it was that in 1933 he went to Washington and saw a General Hoover, then in charge of the branch of the Commerce Department having to do with life preservers. After telling General Hoover what he (Brown) had in mind, the General said that what the Department would like to have was the development of a life preserver that would turn a man on his back, and hold his head out of the water, thereby giving him a chance even though the man was unconscious. Hoover said no preserver that had ever been presented to the Department would accomplish that purpose. With this idea in mind, Brown returned home and after working

"over a period of three months, off and on, * * * this jacket was developed and he reported it to Washington. They were very enthusiastic about it and gave us an approval of it in the regular meeting of their Board in January 1942." The Navy jacket of 1920 was, of course, then in use. Whether General Hoover was aware of its existence does not appear.

In corroboration of Brown's testimony that the Navy preserver is incapable of turning a wearer thereof onto his back, in the event he is unconscious when he goes into the water, a young man named Dorman was called as a witness upon behalf of the plaintiff. At Brown's instance, he tested, upon two occasions, plaintiff's preserver, that of the defendant, and the one in use by the Navy, in a high school fresh water swimming pool at Greenville, Ohio. In describing his use of plaintiff's preserver, Dorman said: "I dove in face forward, and came to the top of the water immediately, and turned around on my back with my head well out of water. I made two tests, one from the springboard three times, and it was about four feet above the water * * * This pad in the back here kept my head from going back and just relax in the water, and my head stayed right in place, would not move either back or forward. I (also) made three tests * * * off the side of the pool and from the springboard with defendant's alleged infringing device. It worked the same as the other, and one was as good as the other so far as I was concerned."

As respects the Navy jacket, Dorman had this to say: "I made the same kind of tests with (it) three times off the side and three times off the board. I fell on my face and I just stayed there. I did not try to save myself or anything. It brought me up to the surface, but I had to raise my head out of the water of my own will and accord. It had no tendency at all to turn me over. Then I laid on my back. I laid on my back all right * * * I tried to lay on my stomach and swim with those two and this here one (the three preservers) and when I stopped swimming with those two (plaintiff's and defendant's products) it would turn me right over on my back and let me rest * * * With them, with my own will, I could keep face down. To tell the truth it was kind of difficult to swim. In making the tests I wore bathing trunks. My mother works for plaintiff but I don't know just what she does. Mr. Brown is paying for my time off, my railroad fare, and hotel bills."

The president of defendant corporation is Joseph Grohs. Engaged in the life preserver business, he personally tests the efficiency of his wares, and being familiar with plaintiff's preserver, he admits that it will turn a man over in the water. He has also made tests of the Navy preserver, and he described his method of doing so as follows: "I get upon a tank in a bathing suit and put a preserver on. I stand at the edge of the tank. I bend over and clasp my both hands underneath my knees and keep my hands locked that way, and let the preserver do what it wants with me * * * The Navy preserver brings you to the top of the water and gradually it just rolls you right over so that your face faces upwards. It is a little harder with the collar on but without the collar it definitely does it. I could not say if it will do so as quickly as plaintiff's jacket, but it would turn you over roughly in five or six seconds, if collar buoyancy is not used."

That plaintiff's preserver possesses distinct merit thus stands conceded. It is also agreed, I think, that the whole matter of operation depends upon the distribution of the kapok contained within the preserver, the minimum quantity to be used in any preserver being regulated by governmental regulation.

Defendant's preserver, while differing in some respects from that of plaintiff, is its substantial equivalent, and if the patents are valid, must be held to be infringements thereon. Potter's application for a patent, after considerable argument back and forth, was rejected by the Primary Examiner. The rejection was based mainly on the patent to Keppler, No. 1,064,743, June 17, 1913, and Bailey No. 1,065,385, June 24, 1913. The former disclosed longitudinally extending preponderances of buoyant material adjacent the front median line of the jacket, which buoyant portion was of gradually increasing thickness from the sides towards the front median · line. One of Keppler's objects, also, was to keep an unconscious person floating face upwards, and he proposed to achieve this end, by the proper proportioning and arrangement of the buoyant portions of the device.

The Examiner, in rejecting Potter's application, had this to say: "A wearer of Keppler's jacket will be turned over from a face downward position if the preserver is tilted to a certain degree, as admitted by

the applicant in lines 28-33, page 2 of the amendment of March 2, 1923. This necessarily implies unstable equilibrium in the face downwards position with the metacenter below the center of gravity. The applicant's device must also be tilted slightly to prevent the metacenter from vertically aligning with the center of gravity since in that position the device is in stable equilibrium. Keppler's device, when operated as stated in connection with the rejection of claims 3-7 will unquestionably be in unstable equilibrium in the face downwards position and the extending buoyant portions will turn the preserver into stable equilibrium."

Potter appealed from the rejection of the Examiner to the Examiners in Chief. Upon the appeal, he submitted two ex parte affidavits, his own, and one of Frederick F. Couch. These were to the effect that a preserver constructed in accordance with the Potter teaching would, within a few seconds, turn a person from a face downward position to a backward reclining position, and that the Keppler construction and certain other devices, having the approval of the United States Steamboat Inspection Service, would not do so. The affidavits were supported by a brief which was designed to distinguish Potter's vest from that of Keppler. Upon receipt of these papers, the Examiners in Chief remanded the matter to the primary Examiner for reconsideration, and he, upon October 12, 1923, withdrew his final rejection, and permitted the patent to issue. He admitted that none of the references cited, including the Keppler patent, disclosed or referred to the fact that their main object and chief aim was to provide a forwardly extending buoyant fin so as to locate and distribute the buoyancy of the life preserver in such manner that inherently it will always exert a positive force to actually turn the body over when facing downwards, and that, as to this feature, no one of the patentees appeared to have had the least conception of the importance of the value of this quality.

With this final conclusion, I can not agree. Keppler's disclosure had to do particularly, as he says, with a device designed for the use of aviators and others likely to be precipitated into the water in a stunned or otherwise helpless condition. His specification goes on to state: By constructing the vest with the stays described it becomes possible to very tightly inflate the vest without distorting its form, and consequently the preserver gives a very stable and unvarying support to the wearer. This point is of the utmost importance for in many cases the wearer will be thrown into the water stunned and unable to control his position. The main air chambers of the life preserver being located at the front, the wearer will inevitably be supported face up and the buoyant action of the cells 14 will lift his head clear of the water as shown in Fig. 6."

From this, I cannot help but think that it was Keppler's purpose that his device would, if its wearer were dazed, or in an unconscious condition, turn him from a face downward position to a backwardly reclining posture. Otherwise, his invention could be of no possible benefit to the unconscious aviator or seamen it was intended to serve. Keppler knew, certainly, how a backwardly reclining position could be maintained and, in my judgment, he revealed the principles by which that position could be attained by an unconscious wearer of his device.

■ Furthermore, the MacFarlane patent No. 1,179,018, April 11, 1916, specified that a construction made according to its teachings would be such that a person wearing the same will automatically assume a rearwardly inclined position face uppermost with the head supported well above the water. This, too, was the objective of Young's patent No. 1,366,400, April 6, 1920. Defendant, with slight and unimportant deviations followed the specifications of the Keppler and McFarlane patents, and constructed two life preservers, using kapok in the Keppler model instead of air. These preservers were tested by Grohs in the swimming pool of the Hotel Shelton on October 14, 1942. Each of them, when he entered the water face downwards, served to bring him to the surface and turned him, gradually, onto his back. He said: "It took a little longer to turn over than the average preserver that we use today." He also testified that the chief differences between the MacFarlane preserver, and that of the Navy, is a matter of stitching and, in this respect, there is a marked similarity between the drawings of the Potter patent, and those of the Navy preserver. This latter device appears not to have been brought to the attention of the Examiner when Potter's patent application was pending. Had it been considered, I feel reasonably sure that

Potter's patent never would have issued. I mean to say that the Navy jacket, quite as efficiently as that of Potter, would serve every object the latter was intended to accomplish. In the Navy jacket, the major portion of the kapok is designed to rest upon the chest or frontal part of the wearer. Its ratio, as against the quantity contained in the back of the jacket is about 6 to 1. With this arrangement, and, for the moment disregarding the collar, I cannot see how anyone who is catapulted in the water, whether in a conscious or unconscious condition, could well do otherwise, when he rises to the surface, than find himself in a backwardly reclining position, with his head well out of the water. Of course, a conscious person might, by his exertions, resist the operation of the laws of physics. But, if he did not do so, and certainly an unconscious person could not do so, he would, after his original submersion, come head first to the surface of the water. The preponderance of kapok on his chest, with its proportionate buoyancy, if the preserver was properly adjusted, would be bunched adjacent the front median line of the jaket and it would immediately cause the wearer to assume a backwardly reclining position in the water. Impact with the water would necessarily give the preserver a tilting movement so as to make this the inevitable result, and, in this connection, one must remember that the almost constant movement of water in the open sea is quite different from the placidity of a high school swimming pool. The kapok contained in the collar of the Navy jacket, to an extent, may possibly tend to retard the attainment of a backwardly inclining position. Nevertheless, the collar, from the standpoint of protection to the neck, may serve a purpose that outweighs the desirability of the immediate assumption of a backwardly reclining position. At any rate, the Navy continues to use its device, and Potter did nothing more than utilize its capabilities. I cannot see that Potter's device will serve any purpose that was not susceptible of accomplishment by the Navy jacket of 1920. In consequence, I am compelled to declare the invalidity of his patent. If the Potter and Brown patents possess any advantages over the capacities of the Navy jacket, in use for more than twenty years, and which is now being provided for the protection of millions of the armed forces of the United States, as they currently face the doubled and trebled hazards of the seven seas, it is incredible that they should not be recognized and adopted as standard equipment.

Furthermore, it may be remarked, as hereinbefore stated, that the peculiar properties of kapok have been known and understood for many years. It has long been used in the manufacture of life preservers. Its relative buoyancy, from the standpoints of weight, distribution and compactness, have been recognized for a period quite as long. If, therefore, in a given case, a certain result is desired, its attainment, in most instances, depends not upon the genius of an inventor, but upon the skilled knowledge of the journeyman who is confronted with the performance of a specific task. To the art of life preservers, Potter gave nothing more than this. Being acquainted with the properties of kapok, he understood that by disposing of a relatively greater quantity of the material along the median line of the chest of a man forced to go into the water, than was distributed in the rear portion of the preserver, the laws of physics would, necessarily, force the wearer of his device to turn upon his back and thus give him a chance for life that might otherwise be denied him. But, in disclosing this, Potter was anticipated by the Keppler, MacFarlane and Young patents, as well as by the Navy life preserver. And, as I have previously said, his patent cannot stand. McClain v. Ortmayer, 141 U.S. 419, 427, 12 S.Ct. 76, 35 L.Ed. 800.

Brown's patent, 1,994,189, is nothing more than a preferred method of manufacturing life preservers designed to achieve the main objective of the Potter disclosure.

With all the prior art before him, Brown, in constructing his device, notwithstanding its fairly large commercial success, cannot be said to have revealed inventive genius.

The bill of complaint will be dismissed with costs.