MILLS et al. v. KEEP et al.

(District Court, D. Oregon. June 24, 1912.)

No. 3,527.

1. MORTGAGES (§ 86*)—FRAUD IN PROCUREMENT—EVIDENCE—SUFFICIENCY.
   In a suit to cancel a note and mortgage, evidence *held* to show that they were procured with intent to defraud the mortgagors by transferring the paper.
   [Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1350, 1355, 1364; Dec. Dig. § 86.*]

2. BILLS AND NOTES (§ 497*)—INNOCENT PURCHASERS—BURDEN OF PROOF.
   Transferees of a note procured by the payee through fraud have the burden of showing that they acquired it in good faith for value, and without notice of its infirmity.
   [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1448, 1675–1681, 1683–1687; Dec. Dig. § 497.*]

3. BILLS AND NOTES (§ 525*)—BONA FIDE PURCHASERS—EVIDENCE—SUFFICIENCY.
   In an action to cancel a note and mortgage procured through fraud by the payee, evidence *held* to show the payee's transferees were innocent purchasers for value.
   [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1832–1839; Dec. Dig. § 525.*]

In Equity. Bill by S. M. Mills and another against Joseph R. Keep and others. Decree for complainants as to defendant Keep, and suit dismissed as to the other defendants.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Bauer & Greene and R. Citron, all of Portland, Or., for complainants.

John H. Hall, of Portland, Or., for defendants Joseph R. Keep and Clear Lake Irrigation & Lumber Co.

Teal, Minor & Winfree, of Portland, Or., for defendant Portland Trust Company of Oregon.

Wm. D. Fenton, Ben C. Dey, and Kenneth L. Fenton, all of Portland, Or., and James E. Fenton, of San Francisco, Cal., for defendants B. C. Mathews, Jr., C. W. Pallett, and E. J. Cowlishaw.

WOLVERTON, District Judge. [1] The complainants sue to have surrendered up to them and canceled a certain note and mortgage for $6,000, executed by them and delivered to Joseph R. Keep, one of the defendants, on the 31st day of May, 1909, on account of fraud perpetrated by Keep in procuring such mortgage. The defendants Mathews and Cowlishaw claim to be the present holders of the note and mortgage for value in due course. This claim is controverted by complainants. The questions for consideration are, first, whether the said note and mortgage were procured through the fraud and deceit of Keep; and, second, whether Mathews and Cowlishaw are holders for value without notice or knowledge of the alleged fraud pertaining to the execution of such instruments.

Some years ago Mills and Keep were friends in the city of Portland, and Mills had during their friendship assisted Keep on occasions in a business way. Mills having gone to Seattle, the parties did not see each other for six years or more, until in the spring of 1909, when Keep called on Mills at the latter's home or place of business in Seattle. He then had the air of prosperity, and represented to Mills and wife that he had been fortunate in his business ventures, and had made a great deal of money, and at once endeavored to interest them in his projects, with the manifest purpose of persuading Mills to invest therein. Among the projects named was the Clear Lake Irrigation & Lumber Company, which had been incorporated for $500,000 and bonded for $300,000, Keep claiming to own the entire capital stock of the concern except 42 shares, and nearly all the bonds. Mills, although apparently impressed with the feasibility of the projects and the likelihood of their proving successful, declined to make any investment therein, giving as his reason that he had no ready means for the purpose. Keep thereupon represented to Mills that it was not his money that he wanted, but that he was in need of Mills' advice and assistance in the management of his business concerns, and that he would have Mills appointed secretary and treasurer of the Clear Lake Irrigation & Lumber Company at a salary of $350 per month, and, furthermore, upon his taking and accepting such position, that Keep would share with him to the extent of a one-half interest in all his projects, thus holding out to Mills the alluring prospect of soon becoming a millionaire. Keep, however, proposed as a guaranty that Mills would accept the position of secretary and treasurer of the Clear Lake Irrigation & Lumber Com-

pany, and become the former's adviser and counsellor in his business concerns, that Mills execute and deliver to Keep his note for $6,000, and a mortgage by himself and wife to secure the payment of the same upon some lots in Seattle of which Mrs. Mills was the owner. This proposition Mills and wife were persuaded to accept, and on May 31, 1909, executed the note for $6,000, payable in three years, and the mortgage to secure its payment according to its tenor, upon the condition, however, that Keep would not negotiate the paper in any way, but would keep it in his own personal possession, and would surrender it up to Mills and wife when the final arrangements were concluded for installing Mills in his position as secretary and treasurer of the Irrigation & Lumber Company and as the adviser and assistant to Keep. As evidence and pledge of Keep's good faith in the transaction, he assigned to Mills 12 bonds of the Irrigation & Lumber Company, aggregating in their face value $6,000. The arrangement was not then finally consummated, but was to be evidenced in its ultimate form by a written agreement between the parties, to be concluded about the 15th of June, following the execution of the note and mortgage. Mr. Mills strongly affirms this to be the case, in which he is persuasively corroborated by another agreement between the parties in tenor as follows:

"This agreement made and entered into by and between Joseph R. Keep, of Portland, Oregon, party of the first part, and S. M. Mills, of Seattle, Washington, party of the second part. Witnesseth: It is hereby mutually agreed by and between the parties hereto that the party of the first part agrees to convey a one-half interest in all of his rights, privileges and interest, of every name and nature, which has heretofore been granted by the United States government, and hereafter granted; also a one-half interest in the Clear Lake Irrigation & Lumber Company, and what will be set forth in a final contract which the party of the first part agrees to have written on or about fifteen days from date, and the party of the second part gives to the party of the first part a mortgage for six thousand (6000) dollars on the property hereinafter described as follows, to wit:

"Lots three (3), four (4), and five (5), and the south ten feet of lot two (2), Northern addition to the city of Seattle, W. T.

"It is hereby mutually agreed further by and between the parties hereto that the party of the first part loans in good faith to the party of the second part twelve (12) first mortgage ten year six per cent. sinking fund gold bonds of the Clear Lake Irrigation & Lumber Company, the same bearing date March 2d, 1908, and numbered as follows: 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92 and 93, inclusive, said bonds containing all of their coupons.

"In witness whereof, the parties hereto have hereunto set their hands the day and year in this instrument mentioned.                    Joseph R. Keep.
                                                                       "S. M. Mills.

"Dated at Seattle, Wash., May 31, 1909."

This agreement lacks much in lucidity of statement, but it does evidence the fact that the parties had not then concluded their final arrangement, but fully intended that such arrangement should be specifically set out by a writing to be executed about the 15th of June following. Inferentially it shows that the delivery of the bonds to Mills was as a pledge, for some purpose not definitely stated. Mr. Mills claims that the note and mortgage were to be returned to him about the middle of June, and that they were not to be as-

signed nor negotiated. His testimony on the subject seems to be clear. It is as follows:

"Q. Now go on and state, Mr. Mills, how you came to make the mortgage and note described in the bill of complaint; that is to say, the note for $6,000, dated on or about the 31st day of May, 1909, bearing interest at the rate of 7 per cent. per annum, due three years after date, secured by mortgage of the same date, upon said lots 3, 4, and 5, and the south 10 feet of lot 2, of Northern addition to the city of Seattle, King county, state of Washington, belonging to Mrs. Mills. A. Well, the final wind-up of this affair was this: Just prior to the issuance and delivery of this note and mortgage or during Mr. Keep's visit at Seattle at my home and at his room in the Butler Hotel, he was given to understand that we had no money, and we could not go into any project at that time.

"Q. What did you say to him at that time? A. We absolutely refused to pay any money.

"Q. Did he ask you to put any money in now? A. Before he had asked, and that had been settled before this.

"Q. You said you had absolutely refused. How urgent had been the request of Keep to put money in the enterprise, did he insist upon it? A. No.

"Q. Did not ask more than once or suggest it more than once or twice? A. He was just probably feeling to see whether I had any money, and I told him I had not and he said, 'I want you in the company anyhow,' and he told me that he would put me in there as secretary of the company and give me a full power of attorney.

"Q. Secretary and treasurer? A. I understood I was to be secretary and treasurer with his full power of attorney, and at that time we agreed on a salary of $350 per month.

"Q. What did he say about wanting to make sure that you would comply? A. I agreed to accept, and he says, 'Now, you might think this matter over, and conclude to refuse after I have gone back to Portland, and I want something from you as a pledge that you will carry out this agreement of yours.'

"Q. Had you made any agreement in writing? A. It was a verbal agreement up to that time. I said, 'Mr. Keep, you can depend upon me that I will come down; tell me when this salary will start and I will be there.' He said, 'I want you inside of two weeks.' So I told him that I would do anything reasonable to pledge my reporting to him at that time. He suggested that I should make this pledge substantial in the shape of a mortgage on these lots.

"Q. Did he suggest that the mortgage on the lots was to be taken as security? A. As security.

"Q. Tell just as near as you can exactly what he said at that time, just how he put it to you and what he asked for as near as you can recollect in his own language. A. Well, he said: 'You have these lots out here. Now you give me a mortgage on those lots to guarantee your coming with me as you say, and I will return that mortgage to you when the final contract is signed up by both of us along the middle of June.' This was about the last of May, 1909.

"Q. Then what did you say to that proposition? A. Well, I told him that I would not object to giving that, but that positively these papers should not be negotiated or go out of his hands, and he gave me his positive assurance that they would not, that it was simply to bind me, so that I would not back out, as to coming down with him and taking this position after he left.

"Q. What was said by him, if anything, about his having to go through the formality of calling a meeting of the board of directors to approve your appointment, or something like that? A. Well, he said the first thing he would do when he got back to Portland was to call a meeting of the board of directors, and oust Kelly, the present treasurer, and have me elected.

"Q. And what did he say to the effect that, if he did that, he wanted something to show or guarantee that you would come? A. Yes. He said he wanted to be positive that I would not back out in the meantime for he would be greatly embarrassed if I did.

"Q. That if he came down and held a directors'·meeting and discharged the other officials, relying upon your promise to come and you did not come, it would seriously embarrass him, is that what he said? A. Yes, sir. That is it.

"Q. And to indemnify and to hold him harmless against that he asked this mortgage, is that what he said? A. Yes; that is what he said, and for no other reason.

"Q. Now, what suggestion did you make Mr. Mills in response to that as to reciprocity in the matter of securing compliance with this verbal agreement that you had had, in other words, some security from him that if you did come down that he would give you what he promised you? A. Of course, naturally, while I had all confidence in him, I told him that he had to give me something to show evidence of good faith on his part, and he said he would give me this contract in a few days, and he said: 'In the meantime here is a half dozen bonds. You can take these and hold these until I go down and draw up these papers, and then you can send them back.'

"Q. Did that matter of asking security from him occur to you at all until he asked you for security on your part in the form of a mortgage? A. Well, I think that I had such confidence in him that it never occurred to me.

"Q. Now, what bonds did he refer to, Mr. Mills? ·A. Well, I would have to tell how it came up.

·"Q. All right, go on.

"A. He told me that they had already issued $300,000 in bonds which were being held I think by the Portland Trust Company.

"Q. The Portland Trust Company were trustees in the bond issue? A. I think something of that kind. He said that he held these bonds, and that he had quite a number of them with him. Five hundred dollar bonds they were.

"Q. How many did he give you? A. He gave me 12 of them.

·"Q. That would be $6,000? A. Yes; $6,000, to offset my valuation.

"Q. Did he tell you what they were worth, or what he considered they were worth, those 12 bonds? A. No; he did not tell me. I think I took it for granted that they were worth what they called for. I simply felt as though I would never have any future use for them and I took them.

"Q. Did you expect to have any more use for those bonds than you thought he would have for your note and mortgage? A. No; I expected to hand them back to him."

The agreement hereinbefore set out was then executed by the parties. Further on Mr. Mills says as to these bonds, in explanation of the agreement, when asked what was said about the party of the first part having loaned in good faith to the party of the second part · those 12 bonds:

"Well, a sort of afterthought. He was handing these to me as security for the fulfillment of his agreement. * * *

"Q. Did Keep say that? A. No.

"Q. Why did you give him the note and mortgage? A. I did it because he insisted upon it more than for any other reason.

"Q. State again so there will be no misunderstanding whether he insisted upon having that note and mortgage and for what purpose? A. So that I would be sure to come to Portland and take·this position that he offered me.

"Q. What, if anything, did he say to you, Mr. Mills, about what he would do with that note and mortgage—what disposition he would make of it? ·A. He told me he would keep them personally himself, and that they would be returned to me without ever having gone out of his hands.

"Q. How soon were you to get them back, how soon after that, when this verbal contract was signed up and you got down to Portland, how long after that or when were they to be returned to you? A. As a matter of fact, he told me that he would give them back to me when he brought this contract and finished it with me. I do not know how you would say it; at any rate, it was to be returned to me within a year. That he would exact no interest from me whatever in any way, and that he would return it back to me."

As evidence of Keep's thrift, he delivered to Mills an elaborate prospectus relative to the Clear Lake Irrigation & Lumber Company, showing a scheme for holding and irrigating lands upon a large scale, and other evidences of his holdings, including a copy of a contract indicating that he had sold to a certain party certain lots in Portland for which he was to receive the sum of $200,000. As to this latter the representation was absolutely false, and, as to his other holdings, it has been shown that they were so incumbered that they were worthless.

It is unnecessary to follow out Keep's deceptions and fraudulent representations to induce Mills to execute the note and mortgage further or in detail, as there can be no question of his corrupt intention and purpose to deceive and overreach Mills and to get from him the note and mortgage in question for the purpose of negotiation at once, if possible. And there can scarcely be a doubt that he so imposed upon Mills and persuaded him, with fraudulent intent, to enter into the transaction complained against. Keep had the mortgage recorded, and in two days thereafter came to Portland and negotiated it.

Keep confessed the allegations of the bill by making no answer thereto, yet he claims on the witness stand that the note and mortgage were given to him so that he could raise money upon them to further his projects. He says:

"This mortgage and note that he [Mills] gave to me for to raise money on it provided that I would give him an equal face value of bonds of the Clear Lake Company."

And further:

"They wanted the 12 bonds, $6.000, as a security for the safe return of this mortgage, but what time was never mentioned."

Thus he admits that the mortgage was to be returned, but asserts that he was to use it for raising money. The two positions are inconsistent, and upon the whole testimony it is clear to my mind that he fully intended to defraud Mills by transferring the paper into the hands of other parties. This disposes of the first phase of the controversy.

[2, 3] We have now to inquire whether Mathews and Cowlishaw are innocent purchasers of this paper for value. The burden is cast upon them to show their good faith in its acquirement for value and without notice or knowledge of its infirmity. The Negotiable Instrument Act, which obtains in Oregon and in Washington alike, provides that:

"The title of a person who negotiates an instrument is defective within the meaning of this act when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith or under such circumstances as amount to fraud." Section 5888, Lord's Oregon Laws.

Further:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of

such facts that his action in taking the instrument amounted to bad faith."
Section 5889, Lord's Oregon Laws.

And again:

"Every holder is deemed prima facie to be a holder in due course; but
when it is shown that the title of any person who has negotiated the instru-
ment was defective, the burden is on the holder to prove that he, or some
person under whom he claims, acquired the title as a holder in due course;
but the last mentioned rule does not apply in favor of a party who became
bound on the instrument prior to the acquisition of such defective title."
Section 5892, Lord's Oregon Laws.

The reason for the rule thus casting the burden of proof upon the
party asserting good faith is said to be found, as announced by the
Supreme Court of Iowa in McNight v. Parsons, 136 Iowa, 395, 113
N. W. 861, 22 L. R. A. (N. S.) 718, 125 Am. St. Rep. 265, 15 Ann.
Cas. 665, "in the presumption that the holder of paper affected in his
hands by fraud or illegality would be likely to indorse it away with-
out consideration to some confederate or agent, and it is therefore
but just to require one who sues upon it to prove his bona fides."

The Negotiable Instrument Act on this subject is but declaratory
of the law as it had come to be settled prior to the adoption of the
act. "The law is well settled" (quoting from Hotchkiss v. National
Banks, 21 Wall. 354, 359 [22 L. Ed. 645]) "that a party who takes
negotiable paper before due for a valuable consideration, without
knowledge of any defect of title, in good faith, can hold it against
all the world. A suspicion that there is a defect of title in the holder,
or a knowledge of circumstances that might excite such suspicion in
the mind of a cautious person, or even gross negligence at the time,
will not defeat the title of the purchaser. That result can be pro-
duced only by bad faith, which implies guilty knowledge or willful
ignorance, and the burden of proof lies on the assailant of the title."

Says the Supreme Court in another case (Murray v. Lardner, 2
Wall. 110, 17 L. Ed. 857):

"The rule may perhaps be said to resolve itself into a question of honesty
or dishonesty, for guilty knowledge and willful ignorance alike involve the re-
sult of bad faith. They are the same in effect. Where there is no fraud there
can be no question."

The Supreme Court of Oregon has given utterance to the same
doctrine, as follows:

"Fraud is proven in such cases when it is shown that the purchaser had
notice or knowledge of defects or infirmities in the title to the paper at the
time of purchase. Knowledge may be imputed either by direct proof or by
evidence of a circumstantial nature, the same as any other fact. If a per-
son is grossly negligent in the exercise of common prudence, this is a fact
competent to go to the jury as evidence of bad faith, but the jury must pass
upon the question whether the purchaser has acted honestly or dishonestly,
and not speculate as to his probable diligence or negligence. Belmont Bank
v. Hoge, 35 N. Y. 65. The rule is thus established that the usefulness of com-
mercial paper may not be restricted, and yet the party taking it is not re-
lieved from the just obligations of the exercise of good faith." Bowman v.
Metzger, 27 Or. 23, 30, 39 Pac. 3, 5, 44 Pac. 1090.

But where the paper is conceived in fraud, and is negotiated in sub-
version of the primary agreement of the parties, without the will or

consent of the maker, the burden is shifted by the statute, as well as under the adjudications of the courts, to the holder of the paper to show that it came into his hands in entire good faith for value, and without notice or knowledge of its infirmities. Stewart v. Lansing, 104 U. S. 505, 26 L. Ed. 866; American Exchange Nat. Bank v. Oregon Pottery Co. (C. C.) 55 Fed. 265, 266.

In this latter case Gilbert, Circuit Judge, says:

"The doctrine seems well established that where a promissory note had its inception in fraud or duress, or is fraudulently put in circulation, an exception arises to the general rule, and the burden of proof falls upon a subsequent indorsee to show that he took the note before maturity, and for value, and without notice."

The bill of complaint was filed in the cause July 27, 1909, and a restraining order was at the same time issued against defendants disposing of the note or mortgage in dispute during the pendency of the suit. Cowlishaw was not made a party, but was subsequently brought in. It is alleged in the answer, and also affirmed by the affidavits of Pallett, Mathews, and Cowlishaw, on their application to have Cowlishaw made a party, in effect that on June 2, 1909, Keep applied to Mathews for a loan of $2,500, and offered the note and mortgage in question as collateral security; that thereupon Mathews agreed that he would examine into the title to the lots covered by the mortgage and ascertain the value thereof, and, if approved, would loan unto Keep such an amount as the condition of the property would justify; that, having made the examination, Mathews agreed to loan to Keep $2,330, and did loan to Keep that sum, and as evidentiary thereof accepted his two notes, one for $2,000, bearing date June 2, and the other for $330, of date June 15, 1909, and that the Mills note and mortgage were indorsed to him as collateral security for the payment of said loan. Then follows the allegation that the loan was made in good faith and for value, without notice of any infirmity in Keep's title to the said note and mortgage. It is further averred that on or about June 20, 1909, Mathews for value sold and assigned to Cowlishaw a one-half interest in said loan, and that Cowlishaw took and received the same also for value and in good faith. To determine whether Mathews and Cowlishaw came by this pledge of the Mills note and mortgage as collateral security bona fide and for value requires a critical examination of the testimony of Keep, Pallett, Mathews, and Cowlishaw. Pallett is a broker in business, and the alleged loan by Mathews and Cowlishaw to Keep was made through him. About this there is no question, and in the entire negotiation Pallett must be treated as the agent of Mathews and Cowlishaw, and whatever notice or knowledge he had or possessed of the true facts touching the Mills-Keep transaction must be attributed to them. The Mills note and mortgage were executed May 31, 1909. Keep represented to Mills that he was going to Portland on the day of their execution. This he did not do until a day or two later, as Mills saw him in Seattle the next day. Mills' suspicion was then aroused, but not to the extent of directly questioning Keep's good faith. On the same day the note and mortgage

were executed Keep took the mortgage to the firm of Calhoun, Denny & Ewing, and procured from them an appraisement of the proximate value of the real property covered thereby, which was fixed at $8,000. He also put into the hands of this firm an abstract of the title to said property, with directions to record the mortgage, and to have the abstract brought down so as to include the mortgage and all tax and judgment liens to date. On June 4th Calhoun, Denny & Ewing forwarded the abstract to Keep in Portland, and on the 12th they forwarded the mortgage to Keep, it having been recorded in the meantime. These facts appear well established.

Keep, it seems, had spoken to Pallett about securing a loan from or through him before he obtained the Mills note and mortgage, and further stated to Pallett that he expected to get the paper from Seattle, without specifically mentioning the amount it was to be given for. Both Keep and Pallett declare such was the case. On the 1st or 2d day of June Keep appeared at the office of Pallett, with Mills' note for $6,000, the appraisement of the lots by Calhoun, Denny & Ewing, of Seattle, and their letter showing the receipt by them from Keep of the abstract of title with instructions respecting it, and applied for a large loan, offering the Mills note and mortgage as security. Pallett would agree to secure for him $2,000 only at the time, and not even this amount until he made further inquiry as to the value of the lots. He telegraphed to one McDonald, an acquaintance of long standing, at Seattle, and satisfied himself in that regard, and thereupon consented to make the loan of $2,000. The loan was procured one-half from B. C. Mathews, Jr., and one-half from E. J. Cowlishaw. A note was taken from Keep to Mathews for the full amount, bearing date June 2, 1909, and the Mills note and mortgage were assigned to Mathews by an instrument bearing date the same day. Mathews is a brother-in-law of Pallett, and both Pallett and Mathews testify that the money was taken from the funds that Pallett then had in his possession belonging to Mathews. Mathews did not have money enough on hand at the time to make the entire loan of $2,000, and consequently the amount was made up through Cowlishaw. Cowlishaw is a broker and money lender also, and he and Pallett had had frequent business transactions together. In advancing his part of the loan Cowlishaw depended largely upon the judgment of Pallett as to the regularity and value of the security offered, and hence made little, if any, inquiry on his own account touching the matter. Mathews gave no attention personally to the negotiation of the loan to Keep, nor to the regularity of the pledge offered as security. Such is the effect of the testimony of Cowlishaw and Mathews.

Referring to the evidence a little more in detail, Pallett testifies in effect that Keep brought in the Mills note, with a letter from Calhoun, Denny & Ewing, stating that it was secured by a mortgage on "this Seattle property," describing the lots and blocks, and wanted a temporary loan. Pallett doubted his ability to secure the money, but Keep was very anxious for a small amount. He wanted a large sum, but was very anxious for a small temporary loan. Pallett fur-

ther relates that he told Keep he would let him know the next day; that Keep came in as arranged, when Pallett told him he could let him have $2,000, having in the meantime telegraphed to McDonald for information as to the value of the lots and received a favorable answer. Pallett is not positive that he gave Keep the money on the date the note executed by Keep to Mathews bears, which is June 2d, but says it was either that day or the next. "Since this examination came up," he relates, "I have been trying to find out all the evidence that I have as to this being a first mortgage on that property, and it occurs to me like I delayed the matter a short time, probably a day or two, until I found out about that, and it may have gone over a day or two. The note would have been dated the day I accepted the loan anyway. * * * At that time, or within a day or two afterward, I loaned him two thousand dollars." Further on he says: "I had a letter from Calhoun, Denny & Ewing appraising this property, and stating, according to my best recollection, that Mr. Keep had given them a mortgage to record against this property to secure this note;" and that he "must have got the abstract along about the 5th or 6th of the month." With all this, Pallett states that he had confidence in Keep's statements to him concerning matters of business, and relied in a measure upon his representation touching the security attending the Mills note, and the fact that the mortgage was a first lien upon the property covered, saving some street assessment. The assignment of the mortgage bears date June 2d. Pallett took from Keep an affidavit bearing date June 3d, in which Keep swore that he was the sole owner of the Mills note and mortgage; that the note was secured by the first and only mortgage on the property described; that the lots were reasonably worth $10,000; and that the affidavit was made for the purpose of obtaining credit by pledging the note and mortgage as security. The abstract was sent to Keep on June 4th, so that it is quite consistent with Pallett's testimony that the $2,000 may have been paid to Keep after the abstract had been received. At least, it is quite probable that it was not paid over until after Keep had given the affidavit on the 3d. This as it relates to the $2,000 loan. The loan of $330 was arranged for on June 15th, the date which the note bears, as a further advance upon the same pledge or security. Mathews and Cowlishaw each advanced one-half of the amount through Pallett.

As to the good faith of the transaction between Pallett and Keep, both say they had had frequent business dealings with each other prior to this time, and several specific negotiations are detailed whereby Pallett has obtained loans for Keep on collateral security of a chattel nature. These loans have generally been paid, and perhaps one or more is still outstanding. While Pallett concedes that he knew that Keep was engaged in promoting some electric and irrigation scheme or schemes, yet he denies that he had any intimate knowledge of their specific nature, or the extent and scope of the projects entered upon. With reference to any loan of money that he at any time made to Keep, however, he says he depended, not on Keep's personal responsibility, but wholly upon the value of the collateral

he had to offer as security. Thus is shown the relationship of the several parties interested, the manner in which the loan of $2,000 was made to Keep, and later the loan of $330, and the collateral accepted as security for the payment thereof.

The vital question remains as to the good faith of the transaction by which the loan was consummated and the Mills note and mortgage hypothecated as security. Keep stoutly denies that the Mills note and mortgage were procured in bad faith, or by fraud or imposition upon the credulity of Mills and wife, and hence denies that he disclosed to Pallett any infirmity whatsoever in the paper when offered as security. Pallett maintains with equal emphasis that he was without any notice or knowledge whatever as to the manner and purpose with which the Mills note and mortgage were obtained by Keep, and there is no specific proof to the contrary. Further, there is no proof in the record that either Mathews or Cowlishaw was apprised in any degree or particular of any infirmity attending the paper. Nevertheless, it is sought to deduce the conclusion that the transaction was attended with bad faith because of the loose methods with which Pallett and Mathews and Cowlishaw dealt as among themselves. For instance, it appears from the testimony of Pallett and Mathews that while the former had been loaning the money and funds of the latter for many years, comprising thousands of dollars, yet neither had kept any books of account between them. This is a thing to be distrusted. They seek to explain it by reason of the fact that Mathews is a brother-in-law of Pallett, and had access to his safe, and that the latter was operating as a broker in loaning the funds of the former; but this does not afford a satisfactory explanation of their method of mutual dealing. It is suggested that Pallett was engaged in loaning his own money through Mathews as a figurehead to cover usury. This, however, is not substantiated. But, if it be true, and the statements that Pallett and Mathews kept no books of account between them are to be discredited, still it does not prove that Pallett knew or had good reason to believe that the Mills note and mortgage were secured through fraud and deceit.

Again, Cowlishaw was unable to say whether he paid his money to Pallett in cash or by check. This also seems somewhat incredible, considering that the suit was instituted so shortly after the transaction was closed respecting the loan to Keep. But it does not in itself impute knowledge to Pallett of Keep's imposition upon Mills.

Another feature of the record should be noticed. The bill of complaint alleges, and the affidavits of Pallett, Mathews, and Cowlishaw depose, that Mathews sold and transferred a half interest in the notes given to him for the money loaned to Keep on or about the 20th day of June, 1909, whereas the testimony of all these persons shows that Cowlishaw advanced his moiety of the loans at the time they were made. How the mistake was made in the pleading and affidavits, if a mistake, is not disclosed, and remains unexplained. Beyond this, the consideration stated in the assignment of the mortgage to Mathews is but $1,000. Why that particular amount was so inserted is also unexplained. But, considering all this, while it tends with other

doubtful circumstances to impair the credibility of Pallett, Mathews, and Cowlishaw, yet it does not render them wholly unworthy of belief. The simple transaction of loaning the money to Keep and taking the Mills note and mortgage as collateral is one that might well have been consummated in the utmost good faith, and there is the testimony of Pallett that it was so consummated, corroborated by the fact that he must have had before him at the time the testimonials from Calhoun, Denny & Ewing showing the value of the property and the existence in their hands of an abstract of the title of the property, and the further circumstance of Keep's making affidavit to the value and condition of the mortgaged property. Pallett further testifies that the loan was one presently made, and that the pledge of the Mills note and mortgage was not given for a previous debt, in which he is supported by Mathews and Cowlishaw, and I am unable to say that these men are so wholly unworthy of belief that I should discard their testimony and find inferentially to the contrary.

I am constrained to the conclusion that the defense that the Mills note and mortgage were taken as a pledge and security for the loans to Keep in good faith and for value has been substantiated by the preponderance of the evidence.

The complaint will therefore be dismissed as to all the defendants except Keep. As to him the complainants are entitled to a decree for the full amount they will have to pay to redeem their note and mortgage.