CHEATHAM ELECTRIC SWITCHING DEVICE CO. v. BROOKLYN RAPID TRANSIT CO. et al.

(District Court, E. D. New York.   October 16, 1915.)

1. JUDGMENT ☞707—RES JUDICATA—PRIORITY OF PARTIES.
   A decree is not res judicata as between other parties than those who were involved in the suit, unless privity in the way of succession to legal burdens is shown.
   [Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1230; Dec. Dig. ☞707.]

2. PATENTS ☞328—INFRINGEMENT—SWITCH-OPERATING MECHANISM.
   The Cheatham patent, No. 612,702, for an electrically controlled switch-operating mechanism for railways, claim 3, held not infringed by the device of the Collins patent, No. 1,152,791, granted after interference proceedings, in which Cheatham claimed the invention as new and as his own, thus admitting the limitation of the claim in suit.

3. PATENTS ☞237—INFRINGEMENT—EQUIVALENT PARTS.
   Similarity of result is not the test of equivalency.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 374, 375; Dec. Dig. ☞237.]

In Equity.   Suit by the Cheatham Electric Switching Device Company against the Brooklyn Rapid Transit Company, the Brooklyn Heights Railroad Company, the Nassau Electric Railroad Company, the Brooklyn, Queens County & Suburban Railroad Company, and the Transit Development Company.   On final hearing.   Decree for defendants.

See, also, 194 Fed. 963, 114 C. C. A. 599; 197 Fed. 563; 209 Fed. 230, 126 C. C. A. 297; 226 Fed. 495.

O. Ellery Edwards, Jr., of New York City, for plaintiff.
Thomas J. Johnston, of New York City, for defendants.

CHATFIELD, District Judge.   This action is based upon claim 3 of patent No. 612,702, issued October 18, 1898, upon an application filed March 12th of that year.   The claim is as follows:

"3. In an electrically controlled switch-operating mechanism, the combination with a trolley wire and trolley wheel, and a double solenoid having a core armature connected with the switch point rail, of parallel contact strips supported at opposite sides of the trolley wire and having upward inclined ends, one of said strips being integral throughout and the other being divided into three sections, an electro-magnet having a spring armature and two contact plates for said armature, the winding of said electro-magnet being connected with the trolley wire and with the integral contact strip, a wire connecting the spring armature with the middle section of the divided contact strip, and wires connecting the contact plates of said spring armature with the windings of the double solenoid, substantially as described."

The same claim of this particular patent and claims 1, 2, and 4 of patent No. 917,541, issued April 6, 1909, to Mr. Cheatham, for an improved form of the same sort of device, were the basis of a suit in this court, tried with a jury, against the Transit Development Company, one of the defendants herein.   Verdict therein for the plaintiff was affirmed upon appeal.   194 Fed. 963, 114 C. C. A. 599.

[1] One of the questions seriously urged by the plaintiff in this case is the proposition of res adjudicata. It may be assumed that a patent adjudicated valid in a prior action will be considered as valid in an action between the same parties. In any other action before the same court, where the issues and the testimony present substantially the same questions as those previously decided, the previous determination would be taken as conclusive, unless some previously unnoted error or omission is presented for consideration. But in the latter case examination of the issue is not beyond the right of the court, as it would be if the question presented by the record had been finally adjudicated *between the parties.*

This proposition was discussed in connection with an action by the plaintiff herein to collect damages for infringement by the use of more of the devices held as infringements in the first action (in 197 Fed. 563) and to extend that decree to cover alleged violation of the injunction by the use of the switch (which is the basis of the present action and which is known as the "type 15 switch") by the various roads comprising the Brooklyn Rapid Transit system in the borough of Brooklyn.

A motion to dismiss for alleged lack of jurisdiction over parties defendant in the second action was discussed in a decision reported in 191 Fed. 727. Decree in that action was based upon an opinion reported in 203 Fed. 285, and affirmed in an opinion reported in 209 Fed. 230, 126 C. C. A. 297. It will thus be seen that much discussion of these patents and of the relation of the parties has already been had both in this and the appellate court.

Much point has been made in this action because certain additional defendants, all of whom are integral members of the system which is controlled or leased and operated by the Brooklyn Rapid Transit Company, are made defendants in an endeavor to bring into the one suit all of the devices under operation on the various street railroads in the borough of Brooklyn. If the question were important, it would be easy to hold, upon the evidence before the court, that identity of information, responsibility, and management was sufficiently shown to hold all of these parties, in the absence of new issues or newly discovered evidence, to any legal effects flowing from the existence of the judgments in the previous suits. On the other hand, there is sufficient difference in the corporate identity of the parties to this action, so that entirely different corporate responsibilities might follow as to liability for the different parts of the judgment.

A decree is not res adjudicata as between other parties than those who have been involved in the preceding litigation, unless privity in the way of succession to legal burdens is shown. The plaintiff has included the Transit Development Company (former defendant), and added the Brooklyn Rapid Transit Company, which appears to control or direct the activities of the constituent companies. It has also included all of these companies by which the switches are used, in order to prevent evasion of responsibility. In so doing, it seeks to unite in one action all the alleged infringing devices, and to be able to show profits to the defendants, as well as damage to the plaintiff, from each device. It is thus avoiding multiplicity of suits, and, as has been stated, the

relations of the parties are such that their rights can be disposed of in the one action, particularly where the use of the devices is made substantially one by the participation of the Transit Development Company and the Brooklyn Rapid Transit Company, and where community of knowledge is established.

But any of the new defendants could raise the separate issue of noninfringement, and any of these defendants must be allowed to try the case, and to urge all the defenses, as if it had been sued independently of those defendants who were directly concerned or participated as parties in the preceding action.

But, though some of the defendants can therefore be heard upon the issue of validity of the patent in suit, it makes no substantial difference in the present case and upon the present record. Upon similar testimony to that presented in the former action, so far as this issue is concerned, and upon the presumption of the patent, the same result must be reached, while the court has also to take into account the fact that, in a suit in this court, this patent has been held valid. Further than this, the validity of the patent and of claim 3, so far as it is based upon an invention and that this invention was that of Mr. Cheatham, is not seriously contested.

[2] The defense of invalidity is restricted to an attempt to narrow claim 3, with which we are concerned in this action, so as to exclude the structure used by the defendants herein, and thus to avoid the charge of infringement of that particular claim as so construed.

Again, the plaintiff claims that the decision of the trial before the jury renders this question res adjudicata against all the present defendants. But on this point the question of res adjudicata presents a slightly different issue.

It is contended by the plaintiff that the previous trial decided this patent to be a pioneer patent, and that the present defendants are bound thereby. As was pointed out in the decision in 197 Fed. 563, the verdict of the jury, in general form, upon all the issues presented, even against the same defendants, left to the court the right to determine just how far an issue had been presented to the jury and just what the effect of the determination of that issue might be.

In the former case before the jury, even though it be assumed that the issue of validity of claim 3, and the issue of its originality as defined and explained in the sense of a basic or pioneer patent, may have been disposed of in the plaintiff's favor, nevertheless the interpretation of what those terms mean, just what is covered by that claim as a basic or pioneer claim, and just what structure would infringe it in that sense, is entirely open, unless the device is identical with that involved in that action. When we consider this question, we come down to exactly the same proposition which has been litigated by the defendants and which is involved in the question of infringement herein.

The court is prepared upon the present record to find that in so far as Mr. Cheatham devised a mechanism for throwing a switch point, by means of ground solenoids practically controlling or moving the switch point, in so far as he transmitted the current to those solenoids from an insulated section of the trolley wire, to which he communicated an elec-

tric current by the closing of a circuit with the flanges of the trolley wheel, and in so far as he planned to have the trolley wheel, when performing this function, separated or insulated from other portions of the trolley wire (either by running the trolley wheel down a shoe or incline, so that it was out of contact with the trolley wire itself, or by maintaining the trolley wire in a lifted position, where the trolley wheel would be out of contact with it), when he so proportioned the parts of his device that a solenoid would be operated by the quantity of current necessary to furnish motor power to the car, but not by the quantity of current that would be continually passing for the use of the lights and heaters, when he contemplated securing a uniform operation or movement of the switch by the application of the motor current, when the trolley wire was upon the so-called insulated or separated section of the parts (taking the place of the trolley wire for the purpose of furnishing current to the car and also of working the switching device), and when he thus made it possible to always operate a switch for a curve by passing over a particular section with power on, and to make it possible to always leave the switch set for the straight track when passing over that particular section with motor power off the controller, he was utilizing and applying ideas that in combination were shown by no one of the patents in the prior art.

Much discussion has been devoted by the experts to such patents as Goetz, No. 489,944, which illustrates a device having two sections of insulated track connected electrically each with one of two solenoids moving the switch point in opposite directions. Likewise two separate sections of the trolley wire may be so insulated from each other that while passing under either one, if the motor current be on the car, electricity will be sent through the section of the track upon which the car rests and move the point the corresponding way. If the car be moved over that track without current, the point will not be moved, but would be moved in the opposite direction by the use of current when the car is under the second or different section of the trolley wire. It will be seen that this would not operate if the motorman cannot use power at the precise point required, and would be of no avail if some preceding or succeeding car or vehicle interferes with his free movement.

The Stone & Webster patent, No. 511,173, of December 19, 1893, showing a set of magnets closing or opening the switch for the curve, according to the use of a current of greater or less intensity, by the motorman, when within a certain limited area under the trolley wire, cannot be operated by having the motor current entirely on or entirely off, but does show the idea of selection of the solenoid by having present a weak or strong current as the case may be.

Another patent cited, showing the operation of the switch with the current entirely on or entirely off, is the Hearn patent, No. 543,181, of July 23, 1895; but this requires the motorman to be able to see the switch point and to move it, when passing under a certain section of the trolley wire, by applying current at that time, if he wishes to move the switch point.

It is unnecessary to discuss the difficulties attendant upon maintaining switch points so that they can be seen under all conditions of weather

and dirt, or the difficulties connected with the necessity of having the motorman operate the switch while at a certain portion of the track and at the same time see which way the switch point is working.

A number of other patents, which illustrate the differences between overhead and underhead trolley construction, raise somewhat the same questions, but none of them completely embody the ideas of the Cheatham patent. It would seem, therefore, that Cheatham was the first person to practically use what is called a "shunt circuit" to set the contact point (or select the contact point) to throw the switch by means of a solenoid, and to transmit this shunt circuit from a portion of the insulated section of wire, which the motorman could easily see, and while under which nothing more would be required than to have his motor current on or off.

As was stated in the charge to the jury in the preceding trial, a patent covering that idea would be a pioneer patent, if the art of making electric switches was based upon and followed the use of these general ideas. Such a patent would not have to be basic, to the extent of depending upon one sole, original conception, which was set forth in and which substantially comprised the entire claim of invention. The idea of Cheatham's patent was not a method patent. The turning of a switch point by means of transmitting electric current was old. The idea of insulating a section of the wire, so as to send a current only when the car was under the insulated section, was old. The idea of having the switch point turn or move when the current was on, and not move when the current was off, was old. But the combination of these features, and the application of the "current on" and "current off" principle to a device which would automatically or always send an electric current to make connection, so as to set the switch point in the desired position, by merely having the current on or off (whether or not the switch point had previously been in the desired position) was first shown in the Cheatham patent.

In the absence of the file wrapper, it is impossible to tell how broadly Mr. Cheatham sought to describe any mechanical instrumentality in the form of an insulated appliance (to take the place of a section of the trolley wire) with the necessary connections to send the requisite currents to accomplish the desired result. But, as the patent was issued, claim 3, which is in suit, seems to be the broadest of the claims which were allowed over the prior art. This claim has in it a number of features admittedly those of the prior art. The use of electricity to operate the mechanism, the use of the trolley wire and the trolley wheel to carry the current, of the solenoid connected with the switch point, of an electro-magnet, producing a contact when desired, wire connections between the various parts as required, and separation of the strips so as to insulate from each other (or separation of a strip into parts so as to insulate the various portions), and a physical inclining or turning up of the end of some strip to guide the trolley wheel, are all shown in the different patents of the prior art. But the *combination* described in claim 3 was new.

During the course of the trial an illustrative model called "type 14," which was the form of device charged to be an infringement in the

action tried before the jury, was used by the experts on both sides as a physical embodiment of claim 3. Examination of the physical exhibit, consisting of the record on appeal in that action, for the purpose of determining what were the issues and the subject-matter of that suit, accurately identifies the device which was there under consideration, and the determination of the appeal, affirming the verdict of the jury, sufficiently fixed as a matter of law the likeness of that device to that described in claim 3 of the patent in suit.

Objection has been made by the defendants to the use of this illustrative model; but, as has been said, both experts, accepting the determination of the previous action as authority therefor, made their comparisons in the present suit between this exhibit and the so-called type 15 switch of the defendant companies. No legal rights of the defendants seem to have been invaded thereby, and the convenience of so doing (instead of carrying the examination back to another set of exhibits, with further complexities introduced by other details of construction) made it seem unnecessary to require the plaintiff to add to the record by either bringing in or substituting the Cheatham exhibit of the previous action. The fact that both experts were able to use the No. 14 switch as an illustrative model shows that no accurate basis exists for objection on this point.

The device known as type 15 is:

"An electrically controlled switch-operating mechanism" combined "with a trolley wire and trolley wheel and a double solenoid having a core armature connected with a switch point rail," * * * "an electro-magnet," * * * "two contact plates" for the sending of current to "the windings of the double solenoid" by means of wires, * * * the "winding of said electro-magnet being connected with the trolley wire and with the" contact strip.

The points of difference between this device and the exact language of claim 3 arise from the words:

"Parallel contact strips supported at opposite sides of the trolley wire and having upward-inclined ends, one of said strips being integral throughout and the other being divided into three sections," and "an electro-magnet having a spring armature and two contact plates for said armature."

In claim 3 the winding of the electro-magnet is connected with the integral contact strip, and a wire connects the spring armature with the middle section of the divided contact strip. It is, of course, evident that, if these contact strips do not exist in this form, the wiring could not be thus accurately described, and on this point substantially rests the defendants' claim of noninfringement.

In the plaintiff's structure, when the trolley wheel reaches the section where the switching device takes the place of the trolley wire, or where the switching device is attached to the trolley wire, the wheel is drawn from the trolley wire by the inclined ends of two strips, one on each side of the trolley wire. These need not be insulated from the trolley wire, unless connected with the next sections of the strips, but at some point in proceeding on this incline the trolley wheel leaves the trolley wire. In the defendants' structure, the trolley wheel is guided by the ends of two strips, or of a plate extending on both sides of the trolley wire, and at some point in the incline leaves the trolley wire.

In both structures it follows the two strips or the two edges of the single strip, as the case may be. In the Cheatham structure, one of the strips at this point is insulated so that no current reaches it unless it passes through the trolley wheel. In the defendants' structure, the entire strip receives current, and as the trolley wheel passes along the strip it raises the strip by the spring of the trolley pole, so that after a short distance the trolley wheel again runs up into contact with the trolley wire. In the Cheatham structure, after having passed beyond this middle or operating section, the wheel runs up ends inclined for the purpose, to again come in contact with the trolley wire.

In the Cheatham structure, one side of this middle or operating section—that is, one strip—is in electrical contact with the trolley wire; but of course the opposite section is not in contact and receives no electricity unless through the trolley wheel, and can send no current through the armature with which it is connected by wire, and hence to either solenoid, unless the trolley wheel is upon this section and is forming a conductor for the current.

In the defendants' structure, current is always present and ready to pass from both sides of the single strip forming this middle section (or, conversely, current is drawn through a wire connection, which passes through the magnet to this section and hence into the trolley wheel whenever the wheel is upon this part of the structure), if connection is made through the car controller, so as to allow the motor current to pass.

In other words, being electrically connected, the trolley wire, the wiring of the magnet and the section against which the trolley wheel is pressing have the same potential, and current will pass when the trolley wheel is connected with the ground.

In Cheatham, however, the potential is not the same between the middle portion or "dead" part of one contact strip and the "live" portion of the other contact strip (which is connected with the trolley wire through the wiring of the magnet) until the trolley wheel furnishes the electrical connection. A spring armature may, of course, be replaced by an armature so arranged as to operate by gravity, in the same way in which the spring would move the arm, and in the type 14 a gravity armature is used.

When, however, in the Cheatham device the trolley wheel transmits current (either motor current or heating current) from the live section to the insulated section, this current is carried by a wire to the armature and through the contact point then in connection to one of the solenoids. So Cheatham provides against waste by sending a current only during the time that the trolley wheel is present. In the type 15 switch the current is sent only after the trolley wheel raises an arm and establishes contact.

If while, under the Cheatham switching device, with the current off the trolley wheel, the motorman wishes to back up the car, and for this purpose turns on the current, he will leave the switch set for a curve, or set it for a curve. Upon again coming under the section, he may set the switch or not according to the way he manipulates his controller. In the defendants' device, inasmuch as the operating section is all of the potential of the trolley wire, and as, of course, no cur-

rent is passing from the mere presence of the trolley wheel, no effect is produced either by the movement of the trolley wheel on or off the section, or by the turning on or off of the current while the wheel is upon that section, unless there is a change in the position of the section itself.

. This is illustrative, rather than distinctive or distinguishing. But the next step in the progress of the car produces a different result. In the Cheatham structure, the car at any time in its progress along the operating section of the device will throw the switch by the presence of a motor current for the car. At any point, also, it will set the switch point for a straight track by sending a weak (or lighting current) if the controller is off.

In the defendants' structure the presence or absence of the current makes no difference, until an independent step has intervened. By the raising of the arm or section, under the pressure of the trolley pole, an oscillating contact finger is tilted against a contact block. The lengths and angles of the parts allow this finger (when free) to tilt in but one direction. When contact is thus made, and the current passes to the solenoid connected with this contact point, the switch point will be moved or held in the position for a straight track, if the car controller is off. But if the motorman be taking motor current at the time that the force of the trolley pole lifts the arm, this current will be drawn through the wiring of the magnet which is connected to the operating section of the device, and the passage of this current will move the core of the magnet, so as to physically interpose it in the way of the movable finger which is about to be tipped by the lifting of the section.

This core thus interferes so as to tip the finger in the opposite direction, and thus to send the current through the opposite solenoid, and to set or maintain the track for the switch. It follows that in the defendants' structure the use of a trolley wheel with a nonconducting flange upon one side, as well as the use of a point (or toe) upon the core of the magnet, made of nonconducting material, would have no effect upon the operation of the device, as no current passes or is transmitted through these points, while in the Cheatham device, as shown in the illustrative model, current must pass from one side to the other of the trolley wheel and must pass through the part moved by the magnetic action of the magnet.

It is evident that, for ordinary purposes, a movable core, which is the idea of a solenoid, and a movable armature attracted or repelled by the magnetic force, are equivalents in effect; but the defendants contend that in this instance the difference between the so-called solenoid and the so-called relay, with an armature proper, shows a difference in principle of the entire device.

Upon a strict reading of claim 3, this contention would seem to be well taken. The defendants do not seek to avoid the presence of the electric current in the entire section with which the trolley wheel comes in contact. They employ an outside or independent means (like the Eaton patent, No. 622,133) to establish an electrical contact by which the current from the trolley wire is sent to one solenoid, and not the other. When the trolley wheel is to use current, they take advantage

of that current to interfere with (by moving a magnetic core) the movable finger before the trolley wheel reaches it, and thus change the action, so as to send the same current to the different solenoid.

In Cheatham the parts are so arranged that the trolley wheel must send a current. If current is being taken from the switching device for the car, then this current is sent directly to the solenoid to operate it in the desired direction, and this current, as it passes through the magnet, also sets the armature. If no motor current is to be taken by the trolley wheel, then a current will still be sent through the trolley wheel, so as to establish or maintain the switch point exactly as if the trolley wheel were running on the trolley wire, instead of a switching device.

The statement of these differences, however, emphasizes the chief point of likeness between the two structures. Both make use of electric current which will pass by the establishment of electrical contact. This contact depends upon a selection by the motorman, merely between having power off and power on when at a certain point in the track. Both devices use the strong motor current to actuate the core of a magnet and to arrange by its movement the necessary form of electrical contact to be used when the motor current is on the car. Both sides have cited cases as to the meaning of the term "equivalents" and as to the range that should be given to a patentee in claiming equivalents for the exact parts stated in the patent.

In O'Reilly v. Morse, 15 How. (56 U. S.) 62, 14 L. Ed. 601, the Morse patent for a telegraph, which was evidently a pioneer patent, was limited to the form of claims chosen by the inventor. In the case of Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136, the patentee was held to the claims of the patent, rather than to the ultimate appreciation or breadth of idea involved in his original concept.

[3] It is evident that similarity of result is not the test of equivalency. Dey Time Register Co. v. Bundy (C. C.) 169 Fed. 807, affirmed 178 Fed. 812, 102 C. C. A. 260; Knapp v. Morss, 150 U. S. 221, 14 Sup. Ct. 81, 37 L. Ed. 1059; Wollensak v. Sargent, 151 U. S. 227, 14 Sup. Ct. 291, 38 L. Ed. 137. The effect of treating Mr. Cheatham as a pioneer in a limited sense presents a situation like that in Groth v. International Postal Supply Co., 61 Fed. 284, 9 C. C. A. 507, and in McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800, which will be cited more particularly upon a succeeding point.

From the standpoint of result and of mechanical effect, the solenoid of type 15, with a nonconducting toe, to trip a movable contact piece, is the equivalent of a relay magnet attracting a spring or gravity armature, which takes the place of the movable finger in transmitting current to two contact points. The sending of a motor current at one time and a lighting current at another, through the trolley wheel as a conductor, is in the same sense equivalent to sending the motor current to one solenoid and the lighting current to another solenoid, by a separate conductor, when the trolley wheel arranges the conducting member instead of forming the same.

A single contact strip, with a movable member to start the formation of the contact, is the equivalent of a member composed of two

parts placed parallel to each other, and with one of these parts used in the same way that the movable member accomplishes the result by other parts in the type 15 switch.

But similarity of result and equivalency in function does not make the parts mentioned the equivalent, as a whole, of the specific device set forth in claim 3 and the specifications of the Cheatham patent; nor does the court consider that the so-called "pioneer" claim of Cheatham, for a practical working device, entitles him to the use of all other practical working devices performing equivalent results.

It appears incidentally that the Patent Office had granted a patent for the No. 15 switch to one Roy V. Collins upon the 7th day of September, 1915, under No. 1,152,791. An interference in the Patent Office between Mr. Collins and Mr. Cheatham was the occasion for an affidavit by Mr. Cheatham, claiming as an inventor the so-called invention of Mr. Collins. In this affidavit Mr. Cheatham stated that the invention was new.

While it is not necessary to hold that Mr. Cheatham has thereby intentionally disavowed a broad construction of the patent in suit, nevertheless the situation created by the affidavit of Mr. Cheatham and the subsequent issuance of a patent to Mr. Collins is so entirely consistent with the interpretation which the court is making of the patent in suit that Mr. Cheatham would seem to be unable to rebut the effect of his affidavit and the presumption of the Collins patent, and it must be held that Mr. Cheatham himself has looked upon the language of his original patent as an unsatisfactory statement of what he now considers his real invention.

In McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800, the patentee was held to have abandoned an idea which he had not included in an earlier patent and which he had sought to cover by a second patent held invalid. The present case leaves Mr. Cheatham in a similar situation. The evidence shows that he may have been the first to use an idea which by its application embodied a principle broader than the idea stated in his patent. It does not appear that he understood the application of the broad principle to be of itself an invention, nor that in describing his device he attempted to do more than to accurately state the mechanical means which he had in mind to produce the result which he realized was to be desired. He did not attempt to claim the idea of accomplishing this result by all possible mechanical means for so doing. He claimed as invention a limited physical embodiment of what might have been expressed in the form of a device for a general purpose, with every range of equivalents in its parts.

The Patent Office might have granted, if Mr. Cheatham had made the claim, a broader patent; but the court cannot now extend the scope of the present patent, and do for Mr. Cheatham what he did not do exactly 17 years ago, when he stated his own claim of his invention and *of what* he desired protection by a patent.

The defendants may have a decree.